RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0438p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LEROY MCKNIGHT, NICHOLAS KLAYO, ROBERT
GRIFFIN,

                      *Plaintiffs-Appellants*,

      *v.*

GENERAL MOTORS CORPORATION,

                    *Defendant-Appellee*.

> No. 07-1479

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70666—Arthur J. Tarnow, District Judge.

Argued: May 2, 2008

Decided and Filed: December 4, 2008

Before: GUY, SUHRHEINRICH, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Dennis D. James, REOSTI, JAMES & SIRLIN, P.C., Pleasant Ridge, Michigan, for Appellants. David Matthew Davis, HARDY, LEWIS & PAGE, P.C., Birmingham, Michigan, for Appellee. **ON BRIEF:** Dennis D. James, Ronald J. Reosti, REOSTI, JAMES & SIRLIN, P.C., Pleasant Ridge, Michigan, for Appellants. David Matthew Davis, HARDY, LEWIS & PAGE, P.C., Birmingham, Michigan, for Appellee.

---

## OPINION

---

      JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellants Leroy McKnight, Nicholas Klayo, and Robert Griffin ("plaintiffs") are former employees of General Motors Corporation ("GM") who accepted the early retirement option provided in GM's pension plans. Each plaintiff also applied for, and received, Social Security Disability Insurance Benefits ("SSDIB") following retirement. Pursuant to provisions of the GM pension plans, plaintiffs' retirement benefits were reduced by the amount received from the government in SSDIB benefits. The primary issue on appeal presents, in part, a question over which the circuits are split: whether disabled former employees have standing under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), to bring suit against their former employers for discrimination with respect to the payment of post-employment fringe benefits. Plaintiffs contend that such employees do have

standing under the ADA, and, moreover, GM's pension plans do not provide equal access to disabled and non-disabled employees. The district court disagreed with plaintiff's contentions and granted summary judgment in favor of GM.

For the reasons set forth below, we conclude that the plaintiffs do not have standing under Title I of the ADA to pursue their claims. Furthermore, we note that, even if plaintiffs had standing, their claims would fail on the merits. We therefore affirm the district court.

## I.

### A. *The Pension Plans*

Plaintiffs challenge provisions in two pension plans offered by GM: the General Motors Hourly-Rate Employees Pension ("GM Pension Plan") and the General Motors Retirement Program for Salaried Employees ("GM Retirement Program") (collectively, "the pension plans"). The pension plans have similar provisions providing for the payment of basic and supplemental benefits to individuals choosing to retire early after thirty years of service. Both pension plans also provide for a reduction in supplemental benefits if a beneficiary becomes eligible for SSDIB prior to reaching the age of 62 and one month.

Pursuant to Article II, Section 6 of the GM Pension Plan, an employee who retires after thirty years of service will receive a monthly early retirement supplement, in addition to the basic pension payment, until age 62 and one month. Section 6 provides:

> (a) An employee who retires under Section 2 . . . and who retires within five years of the last day worked for the Corporation will receive, in addition to the pension, certain supplements as set forth below:

> (1) If the employee retires under Section 2 or Section 3 of this Article II with 30 or more years of credited service at the date of retirement, such employee shall be entitled to a monthly early retirement supplement until age 62 and one month in an amount which when added to the monthly pension under this Plan will equal the amount of total monthly benefit provided in the table set forth below, subject to subsequent provisions of this Section 6: [table omitted].

The plan further provides for a reduction in supplemental benefits if, prior to the age of 62 and one month, the employee becomes eligible for SSDIB:

> (b) The early retirement supplement under provision (a)(1) of this Section 6 for an employee who retires at the employee's option shall be calculated assuming that the basic pension commences immediately after retirement, and such early retirement supplement and the interim supplement under provisions of (a)(2) of this Section 6 shall be reduced for any month prior to age 62 and one month, for which the employee becomes or could have become eligible for a Federal Social Security benefit, by an amount equal to the amount of the temporary benefit to which the employee would have been entitled if retired under Section 2(b) of this Article II.

Similarly, the GM Retirement Program also provides for basic and supplemental benefit payments and contains a nearly identical passage allowing for the reduction of supplemental benefits in light of SSDIB eligibility:

> (b) The early retirement supplement under subsection (a)(1) of this Section 7 for an employee who retires voluntarily shall be calculated assuming that the basic benefit commences immediately after retirement, and such early retirement supplement

under subsection (a)(2) of this Section 7 shall be reduced for any month prior to age 62 and one month for which the employee becomes or could have become eligible for a Federal Social Security benefit, by an amount equal to the amount of the temporary benefit to which the employee would have been entitled if retired under Section 4 of this Article I.

In both pension plans, the "temporary benefit"—the amount by which the supplemental benefit is reduced—is apparently about equal to the amount the beneficiary receives from the government in the form of SSDIB.[1] The district court explained the significance of this plan structure: "Both the Pension Plan and the Retirement Program were designed to achieve what is referred to as 'benefit integration' with Social Security benefits. Benefit integration permits a higher level of income to all retired/disabled employees by allowing benefits under such plans to take credit for other income streams that a participant may be entitled to receive."

### B. *The Plaintiffs*

Leroy McKnight worked for GM as an hourly employee until January 31, 2000. On February 1, 2000, McKnight retired under the GM Pension Plan after completing more than thirty years of service. In November 2000, McKnight began receiving SSDIB benefits, and, accordingly, GM reduced McKnight's supplemental pension payments. GM also claims that, as a result of McKnight's SSDIB eligibility, it overpaid McKnight $10,489.50.

Robert Griffin worked for GM as a salaried employee for twenty-six years and, subsequently, transferred to American Axle and Manufacturing, Inc. After more than thirty total years of service, Griffin retired on December 1, 1998, and he now receives a retirement benefit from the GM Retirement Program for his twenty-six years of GM credited service. Griffin was awarded SSDIB effective April 1, 1999, and his retroactive award resulted in an overpayment by GM of $30,446.40 in supplemental benefits.

Also a former salaried GM employee, Nicholas Klayo retired on January 1, 1999, under the GM Retirement Program, after thirty years of credited service. Klayo was awarded SSDIB effective December 1, 2001, and his retroactive award resulted in an overpayment by GM of $35,166.96 in supplemental benefits.

Plaintiff Carol Dudek does not appeal the decision of the district court.

### C. *Procedural History*

On October 17, 2005, plaintiffs filed an amended complaint in federal district court, alleging that GM's enforcement of the GM Pension Plan and the GM Retirement Program violated the ADA, the Employee Retirement Income Security Act ("ERISA"), and Michigan's Persons With Disabilities Civil Rights Act. On August 29, 2006, GM filed a motion for summary judgment. The district court granted GM's motion on March 20, 2007. The district court concluded that plaintiffs did not have standing under Title I of the ADA, and, even if they did have standing, plaintiffs had no viable ADA claim, as they had equal access to GM's pension plans. The court further found that GM's pension plans did not violate ERISA. Finally, the court declined to exercise supplemental

---

[1] Although the plaintiffs suggest that the entire supplemental benefit payment is terminated upon eligibility for SSDIB, this does not appear to be the case. As the chart detailing the payments received by Leroy McKnight indicates, the supplemental benefit is reduced by the amount the beneficiary receives from the government in SSDIB (the "temporary benefit"), and, if the SSDIB amount is less than the supplemental benefit payment due to the beneficiary, GM continues to provide the remaining portion of the supplemental benefit.

jurisdiction over plaintiffs' state law claims. On appeal, plaintiffs challenge the district court's decision only with respect to their claim under Title I of the ADA.

## II.

We review the district court's grant of summary judgment *de novo*. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008). Summary judgment will be affirmed if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If "a reasonable jury could return a verdict for the nonmoving party," summary judgment for the moving party is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, we draw all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Pursuant to Title I of the ADA, an employer is prohibited from discriminating against a "qualified individual with a disability" with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act defines a "qualified individual" as someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plain language of the Act thus allows only those who are 'qualified individuals' to bring suit." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000). Accordingly, we must first resolve the threshold issue of whether plaintiffs—former GM employees who have been adjudged disabled by the Social Security Administration—are qualified individuals with standing under Title I of the ADA.

### A.

Whether disabled former employees are "qualified individuals" under Title I is an issue that has divided the circuits. The Second and Third Circuits take the minority position—that former employees who are totally disabled can be considered "qualified individuals" with standing to bring suit under Title I. *See Ford v. Schering-Plough Corp*, 145 F.3d 601, 607 (3d Cir. 1998); *Castellano v. City of New York*, 142 F.3d 58, 60 (2d Cir. 1998). The majority position—that former disabled employees cannot be considered "qualified individuals"—has been explicitly adopted by the Ninth and Seventh Circuits. *See Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 457-58 (7th Cir. 2001); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1110 (9th Cir. 2000); *see also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161-62 (10th Cir. 1999) (seemingly adopting majority position in *dicta*). This court and others have also addressed the issue, but prior to the issuance of a potentially relevant Supreme Court decision, *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). *See Parker v. Metro. Life Ins. Co.*, 99 F.3d 181, 186 (6th Cir. 1996) (articulating majority position) (*"Parker I"*), *opinion vacated and decided on other grounds,* 121 F.3d 1006 (6th Cir. 1997) (*en banc*) (*"Parker II"*); *Gonzales v. Garner Food Servs., Inc.*, 89 F.3d 1523, 1531 (11th Cir. 1996) (same);[2] *see also Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771-72 (8th Cir. 1987) (articulating majority view in Rehabilitation Act context).

---

[2] *Gonzales* was overruled by *Johnson v. K Mart Corp.*, 273 F.3d 1035 (11th Cir. 2001), in light of *Robinson*. However, the *Johnson* opinion was vacated when the Eleventh Circuit granted rehearing *en banc*. The case has not yet been heard *en banc*, it has been held in abeyance until the resolution of the K Mart bankruptcy. *See Johnson v. K Mart Corp*, 281 F.3d 1368 (11th Cir. 2002). Thus, it appears that *Gonzales* is the last word on this issue from the Eleventh Circuit.

**1.**

In *Parker I*, this court examined, *inter alia*, whether an employer's long term disability plan, which provided different benefits for mental disabilities and physical disabilities, violated Title I of the ADA. 99 F.3d at 183. The *Parker I* panel upheld the district court's determination that the plaintiff, a disabled former employee, lacked standing under Title I of the ADA because she was not a "qualified individual with a disability" under the ADA. *Id.* at 185. The court explained,

> Under the District Court's interpretation of the plain meaning of that statute, [the plaintiff] was at no time a "qualified individual with a disability." At the time she could "perform the essential functions" of her job, she was not disabled for purposes of her long term disability claim, and therefore was not covered by the Disabilities Act, and at the time her insurance benefits were terminated, she could no longer perform her job.

*Id.* at 186. Agreeing with this reasoning, the court relied in part on *Beauford v. Father Flanagan's Boys' Home*, a case in which the Eighth Circuit found that similar language in the Rehabilitation Act did not apply to disabled employees unable to perform the essential functions of their jobs. *Id.* (citing *Beauford*, 831 F.2d at 771-73). The *Parker I* court further noted that the legislative history of the ADA also supported this interpretation of "qualified individual": "The legislative history . . . indicates that the main purpose of Title I was to ensure that disabled persons could obtain and keep employment, and therefore, it was not intended to provide relief for [the plaintiff]." *Id.*

In *Parker I*, the EEOC argued in an *amicus* brief that the statutory language of 42 U.S.C. § 12112(b)(2) indicates that a former employee who can no longer perform his job is a "qualified individual with disabilities." *Id.* Section 12112(b)(2) explains that the term "discriminate" includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with . . . an organization providing *fringe benefits* to an employee of the covered entity. . .)." 42 U.S.C. § 12112(b)(2) (emphasis added). This provision, the EEOC argued, indicates that Congress intended the ADA to cover discrimination in the provision of fringe benefits; accordingly, "the fact that [a narrow interpretation of 'qualified individual'] would bar most employees from challenging discrimination in the provision of long-term disability benefits strongly suggests that [this interpretation] is incorrect." *Parker I*, 99 F.3d at 186. The *Parker I* court rejected this argument, noting that "[t]he circularity of this reasoning is apparent." *Id.*

Additionally, the *Parker I* court rejected the plaintiff's contention that she was a "qualified individual" because she had the "employment position" of a "benefit recipient."[3] *Id.* The court dismissed this argument as mere "creative thinking," as "benefit recipient" does not appear anywhere in the statute itself. *Id.* at 186-87. Ultimately, the court relied on the plain language of the statute, concluding, "We should not try to rewrite the statute in a way that conflicts with what appears to be fairly clear language." *Id.* at 187. Any remedial gap resulting from this plain language, the court explained, "is for Congress to remedy." *Id.*

The *Parker I* opinion was technically vacated by this court's grant of rehearing *en banc*. The *en banc* court, however, did not address the Title I issue, noting that "Parker did not seek rehearing on the disposition of her Title I claim." *Parker II*, 121 F.3d at 1009 n.2. Although the *en banc* decision did not address the Title I claim, the decision did fully affirm the district court's

---

[3]As noted above, a "qualified individual" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the *employment position* that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).

judgment.  *Id.* 1019.  We also note that other courts have relied on the *Parker I* panel's Title I discussion even after the opinion was vacated.  *See Fobar v. City of Dearborn Heights*, 994 F. Supp. 878, 882-83 (E.D. Mich. 1998); *see also Weyer*, 198 F.3d at 1109; *Hatch v. Pitney Bowes, Inc.*, 485 F. Supp. 2d 22, 31-32 (D.R.I. 2007); *EEOC v. Group Health Plan*, 212 F. Supp. 2d 1094, 1097 & n.6 (E.D. Mo. 2002).

**2.**

Plaintiffs assert that, regardless of its precedential status, the *Parker I* panel's discussion of Title I should be revisited in light of *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997).  In *Robinson*, the Supreme Court considered whether the plaintiff in a Title VII action could sue his former employer for postemployment actions allegedly taken in retaliation for the plaintiff's filing of an EEOC claim.  *Id.* at 339.  The Court held in favor of the plaintiff, concluding that former employees are covered by section 704(a) of Title VII.  *Id.* at 346.

In reaching this conclusion, the Court laid out a roadmap for statutory interpretation.  The Court began:

> Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  Our inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." . . .
>
> The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Id.* at 340-41 (internal citations omitted).  While "at first blush, the term 'employees' in § 704(a) would seem to refer to those having an existing employment relationship with the employer in question," the Court explained that this narrow interpretation of the term cannot withstand scrutiny in the context of § 704(a).  *Id.* at 341.  Specifically, the Court noted, neither § 704(a) nor Title VII's definition of "employee" contains any "temporal qualifier" indicating that § 704(a) only applies to former employees.  *Id.* at 341-42.  Furthermore, the Court observed, while some provisions of Title VII clearly used the term "employees" to mean "current employees," other sections used the word to mean something more inclusive than "current employees."  *Id.* at 342-43.  The Court concluded, "once it is established that the term 'employees' includes former employees in some sections, but not in others, the term standing alone is necessarily ambiguous."  *Id.* at 343.

Having found that the term "employees" as used in § 704(a) is ambiguous, the Court resolved the ambiguity by examining "[t]he broader context provided by other sections of the statute."  *Id.* at 345.  In determining that "employees" includes former employees, the Court noted that several other sections of the statute plainly contemplate the use of the remedial mechanisms of Title VII by former employees, and, moreover, such broad interpretation of the term comports with the purpose of the antiretaliation provisions of the statute.  *Id.* at 345-46.  A narrow interpretation of the term, the Court reasoned, would "vitiate much of the protection afforded by § 704(a)," as it would allow an employer "to retaliate with impunity against an entire class of acts under Title VII—for example, complaints regarding discriminatory termination."  *Id.*

**3.**

Plaintiffs urge this court to reconsider *Parker I*'s conclusion in light of *Robinson* and join the Second and Third Circuits in holding that disabled former employees can bring suit under Title I of the ADA.  We decline to do so.  Rather, we adopt the majority position and conclude that former disabled employees do not have standing under Title I of the ADA.

Analyzing the question of Title I standing for disabled former employees in light of *Robinson*, both Second and Third Circuits found that Title I of the ADA was ambiguous with respect to the definition of "qualified individual with a disability." *See Ford*, 145 F.3d at 606 ("As with the term 'employees' in Title VII, the ADA contains an ambiguity concerning the definition of 'qualified individual with a disability' because there is no temporal qualifier for that definition."); *Castellano*, 142 F.3d at 67 ("[Title I] fails to specify *when* a potential plaintiff must have been a 'qualified individual with a disability' in the context of a claim that the provision of retirement or fringe benefits is discriminatory.") Having determined that Title I was ambiguous as to the definition of "qualified individual," both courts concluded that a broader interpretation would comport with "the plain purpose of sections 12112(a) and (b)(2): to provide comprehensive protection from discrimination in the provision of fringe benefits." *Castellano*, 142 F.3d at 68; *Ford*, 145 F.3d at 607 ("We resolve this ambiguity by interpreting Title I of the ADA to allow disabled former employees to sue their former employers regarding their disability benefits so as to effectuate the full panoply of rights guaranteed by the ADA."). Thus, the Third Circuit found that the language "qualified individual with a disability" includes "disabled former employees, no longer able to work with or without reasonable accommodations." *Ford*, 145 F.3d at 608. In a similar vein, the Second Circuit held that a "qualified individual with a disability" includes a "former employee with a disability who 'with or without reasonable accommodation' could 'perform the essential functions of the employment position' for a period sufficient to establish entitlement to an employer-related fringe benefit (i.e., who is otherwise entitled to receive a fringe benefit)." *Castellano*, 142 F.3d at 69.

In contrast, in a decision subsequent to *Robinson*, *Ford*, and *Castellano*, the Ninth Circuit reaffirmed the view held by the majority of circuits, including this one, prior to *Robinson*: the plain, unambiguous language of Title I does not permit disabled former employees to bring a claim under the act. *Weyer*, 198 F.3d at 1112 ("We agree with the Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits that someone who is totally disabled cannot sue under Title I's unambiguous provisions."). The *Weyer* court distinguished the term at issue in *Robinson*: "Title I, unlike the section of Title VII at issue in *Robinson*, has a 'temporal qualifier.'" *Id.* The court explained:

> Title I says that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual." A "qualified individual" is someone who "*can perform.*" That definition uses the present tense. Thus, one must be able to perform the essential functions of employment at the time that one is discriminated against in order to bring suit under Title I. In addition, one must be discriminated against "because of the disability"—which requires that the disability exist at the time of the discrimination and be the motivation for the discrimination.

*Id.* Furthermore, the *Weyer* court noted, the words "holds" and "desires," both present-tense verbs, indicate that Title I unambiguously excludes former employees. *Id.*

The *Weyer* court deemed this interpretation to be a sensible reading of the statute, as "Congress could reasonably decide to enable disabled people who can work with reasonable accommodation to get and keep jobs, without also deciding to equalize post-employment fringe benefits for people who cannot work." *Id.* The court noted that five "compelling reasons" counsel in favor of a conclusion denying standing to disabled formed employees:

> First, the statute says so, quite plainly. Second, most circuits have said that it says so. Third, there is a sensible purpose Congress may well have had in saying so, which gives us confidence that we understand the words. Fourth, other legislation, such as ERISA, addresses fringe benefits for people unable to perform the functions of a job even with reasonable accommodations. Finally, other sections of the Act suggest that this distinction is intentional. For example, Title III of the Act regarding

public accommodations applies not to "qualified individuals," but simply to any "individual."

*Id.* Noting that the Second and Third Circuits promote an interpretation that "construe[s] Title I contrary to what it says 'in order for the rights guaranteed by Title I to be fully effectuated,'" the *Weyer* court explained that "[i]t is rare, in a diverse democratic republic, for there to be a solid legislative majority for 'fully effectuating' any interest to the exclusion of all competing interests." *Id.* at 1113 (quoting in part *Ford*, 145 F3d at 606). The *Weyer* court concluded that the Second and Third Circuits' method of statutory interpretation has the potential to subvert the intent of Congress: "Legislation often results from a delicate compromise among competing interests and concerns. If we were to 'fully effectuate' what we take to be the underlying policy of the legislation, without careful attention to the qualifying words in the statute, then we would be overturning the nuanced compromise in the legislation, and substituting our own cruder, less responsive mandate for the law that was actually passed." *Id.*

The Seventh Circuit has also joined the Ninth Circuit in adopting the majority position post-*Robinson*. In a 2001 decision, the Seventh Circuit reaffirmed its prior interpretation of Title I,[4] notwithstanding the fact that "*Robinson v. Shell Oil . . .* has persuaded two of our sister circuits that retired employees are covered by the ADA after all." *Morgan*, 268 F.3d at 458. The court noted that its earlier decision had anticipated, and dismissed, the argument presented by *Robinson. Id.* (citing *CNA*, 96 F.3d at 1044-45). The court found that there was a "stark" difference between the question presented in *Robinson*—whether former employees could bring suit against their former employers for retaliation—and that presented in the case before the court—whether the court should "allow[] former employees to complain about postemployment discrimination that does not involve retaliation." *Id.* The court further noted that the plain language of the statute supports the position that totally disabled former employees are not "qualified individuals with a disability." *Id.* at 458-59.

We agree with the position taken by the Ninth and Seventh Circuits. The Second and Third Circuits' finding of ambiguity in Title I is tenuous at best. In dismissing the reasoning of a pre-*Robinson* case finding no ambiguity in Title I, the Third Circuit stated, "[the decision] failed to address the possibility that the disparity between the rights created by the ADA and the apparent legal remedy fashioned by the ADA creates an ambiguity in the eligibility requirements for obtaining a remedy." *Ford*, 145 F.3d at 608 (also noting that "the ADA's proscription of discrimination in fringe benefits generates the need for disabled individuals to have legal recourse against such discrimination and exposes the temporal ambiguity in the ADA's definition of 'qualified individual with a disability'").[5] The *Ford* court appears to have disregarded the plain language of the statute—which does, in fact, contain temporal qualifiers, as explained above—and instead manufactured ambiguity where none existed.

The majority position, however, comports with this court's decision in *Parker I*, and we do not think that *Robinson* requires a decision contrary to *Parker I*. The *Parker I* panel found the statute to be unambiguous, and *Robinson* did not alter the rules of statutory interpretation. Rather, the Court reiterated a well-established cannon of statutory interpretation: "Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" 519 U.S. at 340. As the majority of courts have held, Title I is unambiguous; by its plain language, it does not apply to former employees who are unable to perform the essential functions of their jobs. *See also Hatch*, 485 F. Supp. 2d at 34-35 (adopting, in a thoughtful opinion, the majority position); *EEOC v.*

---

[4] The Seventh Circuit had previously concluded that Title I did not apply to former disabled employees in *EEOC v. CNA Insurance Cos.*, 96 F.3d 1039 (7th Cir. 1996).

[5] This is similar to an argument rejected by the *Parker I* panel, which noted that "[t]he circularity of this reasoning is apparent." 99 F.3d at 186.

*Group Health Plan*, 212 F. Supp. 2d at 1097-99 (finding that *Robinson* did not overrule the Eighth Circuit's evaluation of the issue in the Rehabilitation Act context); *Fobar*, 994 F. Supp. at 881-84 (holding that *Robinson* did not warrant a "revisitation" of the disposition of the issue by the Sixth Circuit in *Parker I*). Furthermore, as other courts have noted, any resulting remedial gap in Title I of the ADA with respect to the provision of fringe benefits is partially filled by ERISA, "which seeks to police . . . fringe benefit abuses." *Hatch*, 485 F. Supp. 2d at 35; *Weyer*, 198 F.3d at 1112.

Accordingly, we conclude that disabled former employees are not "qualified individuals" with a disability under Title I of the ADA.

**B.**

We acknowledge the plain language of Title I suggests that disabled former employees who still "desire" their former employment positions might, in fact, have standing. *Cf. Hatch*, 485 F. Supp. 2d at 34 n.16 (observing that the word "desires" "may reasonably refer to former employees who still desire to work but, because of their disability, no longer are able to do so"). The instant case, however, does not provide us with an opportunity to examine this nuance. At oral argument, plaintiffs' counsel conceded that he "could not say" that his clients, disabled former employees, would return to work if GM permitted them to do so and provided them with reasonable accommodations. As such, plaintiffs neither "hold" nor "desire" their employment positions, as required for standing under Title I of the ADA. *See Weyer*, 198 F.3d at 1112 ("'[D]esires,' in the present tense, refers to people who presently want jobs, as opposed to those who do not, protecting job applicants against discrimination."). Plaintiffs, then, do not have standing to pursue their ADA claims.

**IV.**

We further observe that, even if plaintiffs had standing, the benefit plans in question do not violate the ADA. In *Leheny v. City of Pittsburgh*, 183 F.3d 220 (3d Cir. 1999), the benefit plan at issue provided that police officers who were at least 50 years of age and had at least 25 years of service could receive a retirement benefit equal to 75% of their average monthly pay. *Id.* at 223. Disabled officers who were eligible for this benefit, but who were also receiving worker's compensation, could receive 66 2/3% of pay from worker's compensation and 50% of their pay under the pension plan. *Id.* at 223-34. Significantly, these disabled officers also had the option of rejecting worker's compensation and instead receiving the normal 75% retirement benefit. *Id.* at 230. Accordingly, the court held that the disabled retirees had no ADA discrimination claim:

> Every police officer who has attained 50 years of age and 25 years of service is permitted to receive a 75% pension upon retirement from the force; "every employee is offered the same plan regardless of that employee's contemporary or future disability status." The individual retiree is given the responsibility to decide whether or not to accept worker's compensation in lieu of a 75% pension. Because every eligible retiree is entitled to receive a 75% pension, and because each of the Retirees is permitted to receive a 75% pension when he no longer receives worker's compensation benefits, there is no violation of the ADA.

*Id.* at 230. In reaching this conclusion, the *Leheny* court relied on *Ford v. Schering-Plough*, 145 F.3d 601 (3d Cir. 1998), in which the Third Circuit examined whether an insurance plan providing different benefits for different types of disabilities violated the ADA. Concluding that the plan did not violate the ADA, the court noted,

> Every Schering employee had the opportunity to join *the same plan with the same schedule of coverage*, meaning that every Schering employee received equal treatment. So long as every employee is offered the same plan regardless of that

employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities.

*Id.* at 806 (emphasis added). Likewise, in the instant case, each plaintiff had equal access to the same benefit plan; thus, they too received equal treatment from GM. Accordingly, plaintiffs' ADA claims would also fail on the merits.

## V.

For the foregoing reasons, we affirm the judgment of the district court.