[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10002

_____

KARYN D. STANLEY,

Plaintiff-Appellant,

*versus*

CITY OF SANFORD, FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00629-WWB-GJK

_____

Before WILSON, GRANT, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

Can a former employee sue under Title I of the Americans with Disabilities Act for discrimination in post-employment distribution of fringe benefits? We answered "no" in *Gonzales v. Garner Food Services, Inc.*, 89 F.3d 1523 (11th Cir. 1996). *Gonzales* put us at odds with the Second and Third Circuits but in league with the Sixth, Seventh, and Ninth Circuits. In this appeal, we must decide whether *Gonzales* is still good law after (1) the Supreme Court's decision about Title VII retaliation in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), and (2) Congress's changes to the text of the ADA.

We believe *Gonzales* is still good law. We thus reaffirm that a Title I plaintiff must "hold[] or desire[]" an employment position with the defendant at the time of the defendant's allegedly wrongful act. 42 U.S.C. § 12111(8). Because plaintiff Karyn Stanley is suing over the termination of retirement benefits when she neither held nor desired to hold an employment position with her former employer, the City of Sanford, *Gonzales* bars her claim. We therefore affirm the district court.

**I.**

Karyn Stanley became a firefighter for the City of Sanford, Florida, in 1999. She served the City in that capacity for about fifteen years until she was diagnosed with Parkinson's disease in 2016. Although she managed to continue working as a firefighter for about two more years, her disease and accompanying physical disabilities eventually left her incapable of performing her job. So, at

the age of 47, Stanley took disability retirement on November 1, 2018.

When Stanley retired, she continued to receive free health insurance through the City. Under a policy in effect when Stanley first joined the fire department, employees retiring for qualifying disability reasons, such as Stanley's Parkinson's disease, received free health insurance until the age of 65. But, unbeknownst to Stanley, the City changed its benefits plan in 2003. Under the new plan, disability retirees such as Stanley are entitled to the health insurance subsidy for only twenty-four months after retiring. Stanley was thus set to become responsible for her own health insurance premiums beginning on December 1, 2020. She filed this suit in April 2020, seeking to establish her entitlement to the long-term healthcare subsidy.

Stanley believes the City's decision to trim the health insurance subsidy was discriminatory against her as a disabled retiree. Her complaint alleged violations of Title I of the Americans with Disabilities Act, the Rehabilitation Act, and the Florida Civil Rights Act. She also asserted that, by changing the benefits plan, the City unconstitutionally discriminated against her in violation of the Equal Protection Clause of the Fourteenth Amendment. Finally, she brought a claim under Florida Statutes section 112.0801, which authorizes municipalities to offer employees health insurance.

The district court entered judgment for the City. On a motion to dismiss, the district court concluded that Stanley's claims under the ADA, the Rehab Act, and the Florida Civil Rights Act

were insufficiently pleaded. Relying on our decision in *Gonzales*, the district court reasoned that Stanley could not state a plausible disability discrimination claim because the discriminatory act alleged—the cessation of the health insurance premium payments—would occur while Stanley was no longer employed by the City. The district court later granted summary judgment to the City on Stanley's claims under the Equal Protection Clause and Florida Statutes section 112.0801(1). It reasoned that the City's decision satisfied rational basis review under the Equal Protection Clause and that nothing in the Florida statute prevented the amendment to the benefits plan.

Stanley timely appealed.

## II.

We review a dismissal for failure to state a claim for which relief may be granted *de novo*. *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 809 (11th Cir. 2015). We ask whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Likewise, we review a grant of summary judgment *de novo*. *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013). Summary judgment is proper if the movant shows that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. *Id.* We view the summary judgment record in the light most

favorable to the non-moving party, and we draw all reasonable inferences in favor of the non-moving party. *Id.*

### III.

### *A.*

We begin with Stanley's claims under Title I of the ADA, the Rehab Act, and the Florida Civil Rights Act. The parties agree that our disposition of Stanley's Title I claim will control all three statutory disability discrimination claims. *See Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005). Accordingly, our analysis of Title I and the viability of Stanley's claim under it applies with equal force to her claims under the Rehab Act and the Florida Civil Rights Act.

The dispute between the parties turns on the definition section of the ADA. Title I of the ADA, as originally enacted, made it unlawful to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . employee compensation, . . . and other terms, conditions, and privileges of employment." Americans with Disabilities Act of 1990, Pub. L. 101-336, § 102(a), 104 Stat. 331–32 (1990). The statute defined a "qualified individual with a disability" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position *that such individual holds or desires*." *Id.* § 101(8), 104 Stat. 331 (emphasis added).

We held in *Gonzales* that a former employee who does not hold or desire to hold an employment position cannot sue over discriminatory post-employment benefits. 89 F.3d 1523, 1531. We recognized that the ADA protects against discrimination in fringe benefits, such as health insurance, because these benefits have always been recognized as one example of a term, condition, or privilege of employment. *See* Pub. L. 101-336, § 102(b)(2), 104 Stat. 331; *Gonzales*, 89 F.3d at 1526 & n.9. But because the ADA prohibits discrimination only as to those individuals who hold or desire to hold a job, we reasoned that a former employee cannot bring suit under Title I to remedy discrimination in the provision of post-employment fringe benefits. Under the "prior-panel-precedent rule," we are required "to follow the precedent of the first panel to address the relevant issue, unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018) (quotation marks and citation omitted). And any later en banc or Supreme Court decisions must "actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2005).

Stanley argues that her claim is not barred by *Gonzales* for three reasons. First, she points to a Supreme Court case handed down shortly after *Gonzales*, which she says calls into question our reasoning in *Gonzales*. Second, she points to statutory changes in the text of the ADA, which she says undermine the result in *Gonzales*. Third, she argues that *Gonzales* is distinguishable. We will

start by unpacking our reasoning in *Gonzales*, and then address each argument in turn.

1.

*Gonzales* was the first time we considered a former employee's ability to sue under Title I. Timothy Bourgeois, who suffered from AIDS, was fired from his job but kept receiving health insurance through his former employer. *Gonzales*, 89 F.3d at 1524. About six months after the termination, Bourgeois's former employer amended its health insurance plan by capping AIDS-related coverage. *Id.* In the time between that amendment and Bourgeois's death, he incurred significant treatment costs for which he was denied coverage. *Id.* at 1525. August Gonzales, the administrator of Bourgeois's estate, sued under Title I, alleging that the insurance plan amendment was unlawful disability discrimination. *Id.* at 1524.

Relying on "the plain language of the ADA," we held that Bourgeois (and thus his estate) had no viable Title I claim "because he neither held nor desired to hold a position with [his former employer] at or subsequent to the time the alleged discriminatory conduct was committed." *Id.* at 1526. That conclusion followed from the text of Title I's anti-discrimination provision. It expressly applied only to "qualified individual[s] with a disability" who "hold[]" or "desire[]" an "employment position." Pub. L. 101-336, § 101(8), 104 Stat. 331. We also relied on Title I's listed examples of discrimination, which mentioned only "qualified individual[s] with a disability," "applicant[s]," and "employee[s]" as possible victims of

disability discrimination. *Id.* § 102(b)(1), 104 Stat. 332; *see Gonzales*, 89 F.3d at 1526–27 & nn. 10–11. We explained that each of these terms had an inherent temporal qualification: a qualified individual with a disability held or desired to hold a job when the discrimination occurred; an employee was "an individual employed by an employer" when the discrimination occurred; and an applicant, although not defined by Title I, was necessarily someone who had applied for a job when the discrimination occurred. *Gonzales*, 89 F.3d at 1526–27 (citation omitted).

In interpreting the ADA in *Gonzales*, we recognized that other employment discrimination statutes, such as Title VII of the Civil Rights Act of 1964, have been construed to protect former employees. *See id.* at 1527–29. We noted, however, that the precedents adopting that interpretation arose in the context of retaliation, not discrimination. *See id.* We found that distinction important. As we had previously held, such a construction was "necessary to provide meaning to anti-retaliation statutory provisions and effectuate congressional intent." *Id.* at 1529 (citing *Bailey v. USX Corp.*, 850 F.2d 1506, 1509 (11th Cir. 1998)). That is, by prohibiting retaliation, a statute necessarily contemplated that it would apply to individuals who accused a former employer of unlawful behavior. *See id.* at 1529 n.14 ("[W]e note that many retaliation claims are filed by former employees alleging, for example, post-employment blacklisting."). So we endorsed a broad interpretation of anti-retaliation provisions to avoid excluding an especially vulnerable class of people from the statute's protection and thus undermining Congress's remedial scheme.

We explicitly declined to extend this reasoning to Title I discrimination claims in *Gonzales*. Title I's "qualified individual" definition, we said, was dispositive evidence that "Congress intended to limit the protection of Title I to either employees performing, or job applicants who apply and can perform, the essential functions of available jobs which their employers maintain." *Id.* at 1527. We concluded that the plain language of Title I's anti-discrimination provision did not "frustrate the statute's central purpose"—i.e., protecting disabled people who can nevertheless perform the essential functions of a job—the way that a "literal interpretation" of other statutes' anti-retaliation provisions may have threatened to do. *Id.* at 1528–29. Instead, to construe Title I to apply to former employees would "essentially render[] the [qualified individual] requirement . . . meaningless." *Id.* at 1529.

Thus, after *Gonzales*, the rule in this circuit was settled. To fall within Title I's anti-discrimination provision, a plaintiff's claim must depend on an act committed by the defendant while the plaintiff was either working for the defendant or seeking to work for the defendant. The result was that a former employee could not sue for alleged discrimination in post-employment fringe benefits.

That settled rule was briefly disturbed five years later when a panel of this Court declared *Gonzales* overruled by intervening Supreme Court precedent. *See Johnson v. K Mart Corp.*, 273 F.3d 1035 (11th Cir. 2001). The Supreme Court, in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), held that an individual could sue his or her former employer under Title VII for a post-employment retaliatory

act. The *Johnson* majority considered *Robinson* to be a decision of such magnitude that it "mandate[d] the conclusion that *Gonzales* is no longer good law and must be deemed overruled." *Johnson*, 273 F.3d at 1037. The *Johnson* majority then held that Title I prohibits discriminatory acts against current and former employees alike. *See id.*

But *Johnson*'s precedential life was short-lived. The opinion was vacated when this Court voted to rehear the case en banc. *Id.* at 1070. K Mart later filed for bankruptcy, the parties settled, and the appeal was dismissed. *See Johnson v. K Mart Corp.*, 281 F.3d 1368 (11th Cir. 2002) (en banc). Because of the bankruptcy and settlement, we never issued an en banc opinion in *Johnson*. But the result of our en banc vacatur is that *Gonzales* regained its status as this Court's governing precedent on Title I's qualified individual requirement.

2.

We now turn to Stanley's arguments. The centerpiece of Stanley's appeal is her request that we resurrect *Johnson*, ignore *Gonzales*, and hold that, after *Robinson*, former employees can sue under Title I for post-employment discrimination. But Stanley greatly overstates *Robinson*'s impact. "For a Supreme Court decision to undermine panel precedent to the point of abrogation, the decision must be clearly on point and *clearly contrary* to the panel precedent." *Edwards v. U.S. Att'y Gen.*, 56 F.4th 951, 965 (11th Cir. 2022) (quotation marks and citation omitted). This can happen "where the Supreme Court has clearly set forth a new standard to

evaluate" a claim or issue. *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). But *Robinson* did nothing of the sort.

The Supreme Court's holding in *Robinson*—a Title VII retaliation case—did not even upend our Title VII precedents, much less our Title I caselaw. Long before *Robinson*, we had held that Title VII's anti-retaliation provision allowed claims for post-employment retaliation. *See Gonzales*, 89 F.3d at 1528–29. *Robinson* adopted the same rule. But, in *Gonzales*, we distinguished Title I discrimination claims from our Title VII precedents based on the different text of the ADA. *Id.* Because *Robinson*'s interpretation of Title VII did not change our Title VII caselaw, it is hard to say it overruled our Title I caselaw. Judge Carnes said it best in his *Johnson* dissent: "It is a bit audacious . . . to say that a Supreme Court decision whose holding was anticipated, acknowledged, and considered by a prior panel when deciding a different issue has undermined that prior panel's decision on the different issue to such an extent that it may be disregarded." *Johnson*, 273 F.3d at 1068 (Carnes, J., dissenting).

Like its holding, *Robinson*'s reasoning also does little to undermine *Gonzales*. Title VII's anti-retaliation provision at issue in *Robinson* applies to "employees." 42 U.S.C. § 2000e-3(a). Neither the statutory definition of "employees" nor the anti-retaliation provision's specific use of that term provides any "temporal qualifier." *Robinson*, 519 U.S. at 341–42. Looking to the rest of Title VII, the *Robinson* Court found that Title VII regularly "use[s] the term 'employees' to mean something more inclusive or different than 'current employees.'" *Id.* at 342. For example, reinstatement is a Title

VII remedy. *Id.* (quoting 42 U.S.C. §§ 2000e-5(g)(1), 2000e-16(b)). Because "one does not 'reinstate' current employees," the *Robinson* Court reasoned that Title VII's remedial provisions' use of "employees" "necessarily refers to former employees." *Id.* (brackets omitted). The term "employees" in Title VII's anti-retaliation provision was, therefore, ambiguous because it could be "consistent with either current or past employment." *Id.*

Title I's anti-discrimination provision is not afflicted with any such ambiguity. There is a clear temporal qualifier in Title I: Only someone "who, with or without reasonable accommodation, *can* perform the essential functions of the employment position that such individual *holds* or *desires*" is protected from disability discrimination. 42 U.S.C. §§ 12111(8) (emphases added), 12112(a); *see also Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1280–81 (11th Cir. 2005). "Can," "holds," and "desires" are in the present tense. So, to be a victim of unlawful disability discrimination, the plaintiff must desire or already have a job with the defendant at the time the defendant commits the discriminatory act. *See McKnight v. Gen. Motors Corp.*, 550 F.3d 519, 520 (6th Cir. 2008); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir. 2000). And unlike Title VII's varied use of "employees," Title I consistently uses the term "qualified individual" to refer to active employees or current applicants. *See* 42 U.S.C. §§ 12111(8), 12112(a)–(b), 12114.

We acknowledge that the circuits are split. Our reading of *Robinson* aligns us with the Sixth, Seventh, and Ninth Circuits. Each of those courts has held that (1) *Robinson* does not implicate Title

I's anti-discrimination provision and (2) Title I does not protect people who neither held nor desired a job with the defendant at the time of discrimination. *See McKnight*, 550 F.3d at 522–28; *Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 457–59 (7th Cir. 2001); *Weyer*, 198 F.3d at 1108–13. The Second and Third Circuits have held that Title I's anti-discrimination provision is ambiguous, however, and have resolved that purported ambiguity in favor of former employees. *See Castellano v. City of New York*, 142 F.3d 58, 66–69 (2d Cir. 1998); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604–08 (3d Cir. 1998).

We are not convinced by Stanley's argument that we should follow the Second and Third Circuits. The question we are answering here is whether *Robinson* is so compelling that it justifies ignoring a prior precedent. But neither the Second nor Third Circuit answered that question. Moreover, a review of those courts' decisions convinces us that we are on the right side of the split. Neither court established that the text of Title I's anti-discrimination provision is ambiguous. Instead, the Second and the Third Circuit expressed something between discomfort and disagreement with the policy choice underlying the line, drawn by the text of the ADA, between disabled individuals who hold or desire to hold a job and those who do not. *See Castellano*, 142 F.3d at 67–68; *Ford*, 145 F.3d at 605–06. But not "even the most formidable policy arguments" empower a court to ignore unambiguous text. *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021) (quotation marks and citation omitted). Nothing in *Robinson*, *Castellano*, or *Ford* gives us a basis to ignore *Gonzales*.

3.

We are also confident that *Gonzales* survived Congress's amendments to the ADA. Stanley points to two pieces of post-*Gonzales* legislation—the ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553, and the Lily Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, 123 Stat. 5—and argues that because both acts amended the ADA's text, we are free to, and should, depart from *Gonzales*'s interpretation of the original text of the ADA. It is of course true that when Congress amends a statute, we need not follow decisions interpreting discarded statutory language. But we consider a prior precedent overruled by subsequent legislation only if the congressional amendment represents "a clear change in the law." *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 840 (11th Cir. 2003) (citation omitted). Neither the ADAAA nor the Fair Pay Act fits that bill.

Turning first to the ADAAA, we cannot say that the ADAAA upset *Gonzales*'s interpretation of Title I's qualified individual definition. The ADAAA altered Title I's anti-discrimination provision. Where Title I originally said that employers could not "discriminate against a qualified individual *with a disability because of the disability of such individual*," Pub. L. 101-336, § 102(a), 104 Stat. 331 (emphasis added), it now prohibits discrimination "against a qualified individual *on the basis of disability*," 42 U.S.C. § 12112(a) (emphasis added). But the definition of "qualified individual"—someone who, "with or without reasonable accommodation" is able "to perform the essential functions of the employment position that

such individual holds or desires"—was materially unchanged by the ADAAA and remains in effect today. *Compare* Pub. L. 101-336, § 101(8), 104 Stat. 331 *with* 42 U.S.C. § 12111(8); *see* Pub. L. 110-325, § 5(c), 122 Stat. 3557 (striking "with a disability" but otherwise leaving section 12111(8) as originally enacted). So the text upon which we relied in *Gonzales* is still the operative text in the statute.

Stanley contends that the result in *Gonzales* undermines Congress's purpose in adopting the ADAAA. The purpose of the ADAAA, says Stanley, was to broaden the scope of Title I. We have no doubt that is true; Congress said as much when passing the ADAAA. *See* Pub. L. 110-325, § 2(a)–(b), 122 Stat. 3553–54. But only the rare statute pursues its purpose to the exclusion of everything else. The ADAAA expanded Title I's protections by expanding the mental and physical conditions that satisfy the statutory definition of "disability." *See id.* Nobody disputes that Stanley is disabled. The issue here is whether Stanley was a "qualified individual" at the relevant point in time. And the substance of the qualified individual standard, including the temporal qualifications, was unaffected by the ADAAA. *See Adair v. City of Muskogee*, 823 F.3d 1297, 1306–07 (10th Cir. 2016); *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245–47 (5th Cir. 2013).

So too for the Fair Pay Act. To be sure, the Fair Pay Act effected a serious change in employment law. Before the Fair Pay Act, discriminatory compensation claims generally accrued at only one point in time: when the discriminatory compensation decision or practice was made or adopted. *See Ledbetter v. Goodyear Tire &*

*Rubber Co., Inc.*, 550 U.S. 618, 621 (2007). That rule posed serious statute of limitations problems for potential plaintiffs, who may not have even learned of the discriminatory compensation scheme until well after its initial adoption. *See id.* at 649–50 (Ginsburg, J., dissenting). The Fair Pay Act reflects Congress's decision to relax the statute of limitations. Pub. L. 111-2. § 2(1)–(2), 123 Stat. 5. Now, a claim for discriminatory compensation accrues "when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice . . . ." 42 U.S.C. § 2000e-5(e)(3)(A); *see id.* § 12117(a); Pub. L. 111-2, § 5(a), 123 Stat. 6 (stating that the Fair Pay Act "shall apply to claims of discrimination brought under title I").

The Fair Pay Act made it easier to sue after discrimination—as defined by Title I—occurred. *Cf. AT&T Corp. v. Hulteen*, 556 U.S. 701, 713–16 (2009); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 888 (7th Cir. 2012). But, like the ADAAA, the Fair Pay Act did not change the statutory language that we relied on in *Gonzales*. Both before and after the Fair Pay Act, a Title I discrimination claim requires a plaintiff to show that he or she was a "qualified individual" who was subject to discriminatory terms, conditions, or benefits of employment. The Fair Pay Act's relaxed statute of limitations helps a plaintiff only if that plaintiff otherwise has a claim for discrimination. Because nothing in the Fair Pay Act changes Title I's substantive requirements, *Gonzales* is still binding precedent with respect to a former employee's ability to sue under Title I.

4.

Because we hold that *Gonzales* is still good law, we must ask whether Stanley was a disabled employee or job applicant capable of performing the job at the time of the alleged discrimination. There are three points in time in which Stanley can theoretically root her Title I claim: (1) in October 2003, when the City amended the benefits plan; (2) whenever she first became subject to the allegedly discriminatory provisions of the benefits plan as a disabled employee; or (3) in December 2020, when she was affected by the termination of the health insurance premium payments.

Neither option 1 nor option 3 works for Stanley. Although she was employed by the City in October 2003, she concedes, and we agree, that her claim cannot turn on the 2003 amendment to the benefits plan because she was not yet disabled at that time. Although she was disabled at the time of the December 2020 termination of the health insurance premium payments, that option doesn't work because, by that time, Stanley's relationship with the City was as retiree, not employee. She did not hold or desire to hold, nor was she qualified to hold, an "employment position" with the City, as required by Title I's anti-discrimination provision and *Gonzales*.

In response to this reasoning, Stanley makes an argument similar to one advanced by the estate administrator in *Gonzales*. She argues that she was a "qualified individual" in December 2020 and remains so today because the "'employment position' that [she] now holds is that of a retired employee . . . ." But we rejected that

argument in *Gonzales*, refusing to recognize "post-employment benefits recipient" as a job. 89 F.3d at 1530. In light of *Gonzales*, we must reject Stanley's identical argument today.

The final option is that Stanley suffered discrimination as a disabled employee at some unknown point *before* she retired but *after* she was diagnosed with Parkinson's. Stanley argued at oral argument that, while working for the City in the two years after her Parkinson's diagnosis, the writing was on the wall that she would need to take disability retirement. So, the argument goes, the allegedly discriminatory benefits plan became a finalized term of her employment whenever disability retirement became a foregone conclusion. The upshot is that a completed claim of disability discrimination may have accrued while Stanley was a qualified individual performing her duties as a firefighter.

This argument, if successful, would distinguish Stanley's case from *Gonzales*, where the alleged discrimination occurred entirely after the employment relationship had already terminated. But it would not distinguish this case from decisions of the Sixth and Ninth Circuits. Those circuits have held that a Title I plaintiff must be a qualified individual, not only at the time of discrimination, but also when the plaintiff files suit. *See McKnight*, 550 F.3d at 528; *Weyer*, 198 F.3d at 1108–09. The Sixth and Ninth Circuits are on our side of the split. So, even though Stanley's argument is not foreclosed by our holding in *Gonzales*, there is some tension between this argument and our reasoning in *Gonzales*.

We need not resolve this tension today because Stanley waited too long to make this argument. In the district court, Stanley's sole argument in support of her qualified individual status was that the *Johnson* majority was correct, so the district court should ignore *Gonzales*. But Stanley did not try to distinguish her case from *Gonzales*, essentially conceding that she loses if *Gonzales* applies. Then, in her initial brief on appeal, Stanley affirmatively conceded that "[i]n this action, Ms. Stanley does not claim she was impacted by the discriminatory 24-month rule during her employment." The first time this argument appeared was in the United States' brief as amicus curiae in this Court. We will not consider arguments raised only by amici. *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991). That rule is particularly appropriate where, as here, a party did not make an argument to the district court and specifically disclaimed the argument in its own brief.

Because Stanley cannot establish that the City committed any discriminatory acts against her while she could perform the essential functions of a job that she held or desired to hold, her Title I claim fails. For the same reason, so do her claims under the Rehab Act and the Florida Civil Rights Act.

*B.*

Finally, we turn to Stanley's claims under the Equal Protection Clause and Florida Statutes section 112.0801. The district court concluded that the City was entitled to summary judgment on both claims. We agree.

The City's benefits plan does not run afoul of the Equal Protection Clause. Disabled persons are not a suspect class, and government-paid health insurance is not a recognized fundamental right, so we scrutinize the City's benefits plan under the lenient standard of rational basis review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445–46 (1985); *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017). We do not grade the wisdom of the City's decision. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). If "there is any reasonably conceivable state of facts that could provide a rational basis for the" City's decision, it will be upheld. *Id.* (citation omitted). The City's benefits plan advances the legitimate governmental purpose of conserving funds. And its chosen method—decreasing the number of employees for whom the City subsidizes health insurance—is rationally related to that legitimate purpose. So there is no equal protection problem here.

Neither does the City's benefits plan violate Florida Statutes section 112.0801. The statute requires that a "municipality . . . that provides . . . health . . . insurance . . . for its officers and employees and their dependents upon a group insurance plan or self-insurance plan shall allow all [retired] personnel . . . the option of continuing to participate in the group insurance plan or self-insurance plan." Fla. Stat. § 112.0801(1). The health insurance must be offered at the same "cost applicable to active employees," but "[f]or retired employees . . . , the cost of continued participation may be paid by the employer or by the retired employees." *Id.* Stanley receives exactly what she is owed under the statute: the *option* to remain on the City's health insurance plan. The statute does not require the City

22-10002               Opinion of the Court                    21

to pay Stanley's health insurance premiums. To the contrary, the statute grants the City discretion over whether to pay retirees' premiums. The City cannot violate a statute by exercising the discretion specifically granted by that statute.

**IV.**

The judgment of the district court is **AFFIRMED.**