**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 22-12028

————————————————

STACEY BRIDGES,
CHARITY TESSENER,
JESSICA RAINER,
WHITLEY GOODSON,
MEGAN DUNN,
ALLISON MANN,

*Plaintiffs-Appellants,*

*versus*

J.C. POE, JR.,
    Individually and in his official capacity as
    Chief of the City of Jasper Police Department,
DEBORAH JOHNSON,
    Individually and in her official capacity as
    a Jail Supervisor,
DENNIS BUZBEE,
    Individually and in his official capacity as Jailor,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:19-cv-00529-LSC
Consolidated with D.C. Docket Nos. 7:19-cv-01314-LSC, 7:19-cv-01392-LSC,
6:19-cv-01399-LSC, 7:19-cv-01571-LSC, and 7:19-cv-01961-LSC

_____

Before GRANT, ABUDU, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

Some cases have both difficult facts and clear law that bars recovery. This is one of them. Stacey Bridges and five former inmates of Jasper City Jail credibly allege that they suffered widespread sexual abuse at the hands of their jailers. The problem is that they sued various jail administrators and Jasper City—but not their primary alleged abuser. And to hold any of those administrators or the City liable, the plaintiffs needed to show a link between the administrators' actions and the alleged violations. But they did not offer one. Without knowledge, or even suspicion, about what was going on, jail administrators could not have offered so much as tacit approval for the monstrous behavior the plaintiffs allege—much less an unofficial custom or policy of tolerating sexual abuse. We therefore affirm the district court's grant of summary judgment to the defendants.

**I.**

The facts here are complicated, so we break them into several parts. We first describe the defendants, then the jail's policies and procedures, and then the plaintiffs and their

allegations. We close by considering the plaintiffs' attempts to raise their concerns and the litigation that followed.

## A.

As chief of police for the City of Jasper, J.C. Poe Jr. was responsible for the management, efficiency, and general conduct of the police department, including the jail. According to the department manual, he could create, enforce, and approve changes to policies and procedures at the jail. Poe could also hire, suspend, or dismiss jail employees. In short, he was "ultimately responsible for the operation of the jail."

Though Poe was the final authority, chief jailer Deborah Johnson ran the show, overseeing day-to-day operations. She trained employees, assisted jail officers in carrying out their tasks, and monitored employee compliance with rules and regulations. Johnson's duties also included addressing disturbances and complaints at the jail, all of which were to be recorded in the jail's logbook.

The other defendants played roles in the life of the jail too. David Mize served as jail administrator and was Johnson's direct superior. His duties included recruiting and hiring jailers, maintaining "control and order of the jail," and generally ensuring that "the jail was operating the way it was supposed to." Dennis Buzbee and Rusty Boyd were jailers. They booked inmates entering the jail, searched them for contraband, and made sure they had their hygienic and personal necessities. Like all jail employees, Buzbee and Boyd were responsible for the "proper

safeguard" of inmates in their custody. And though Boyd was the primary sexual antagonist named in the pleadings, only Buzbee was named as a defendant.

Some Jasper inmates earned what the jail called "trustee" status. Trustees washed cars, laundered uniforms, prepared meals, and so forth. A perk of these extra duties was that trustees had more time out of their cells; sometimes they even got extra meals at night. Trustee status was a "privilege, not a right," and jail policy entrusted Johnson, the supervisor, with selection of trustees (though there was some evidence that Mize played a role too). Still, no formal selection process existed, and the parties dispute who really appointed the trustees. Bridges, for instance, said that Boyd began to select inmates to serve as trustees at some point, and Dunn said that Boyd would also escort non-trustee inmates out of their cells under the guise of the program. Mize disagreed, testifying that jailers were not allowed to appoint trustees without his permission or Johnson's. He did not recall granting Boyd such permission.

As for the department's policies and procedures for investigating and responding to inmate complaints, the relevant guides included the police department manual, the jail's internal manual, and the City's employee handbook. The most relevant of the three for our purposes is the jail's internal manual, which expressly prohibited fraternizing or sexually engaging with inmates. The manual also forbade "subject[ing] inmates to any form of physical or emotional abuse." Finally, it required on-duty

jailers to "maintain a log of all activities," including "any disturbances, injuries, attempted assualts [sic] or suicides or any other event involving safety or security threats."

As chief jailer, Johnson was required to report employee violations of both department regulations and law to her "commanding officer." And employees had to escalate information that they received about any "matters that indicate the need for police action." Each employee was also responsible for "assisting in the prevention of harassment" by "[r]efraining from participation in, or encouragement of, actions that could be preceived [sic] as harassment" and "[r]eporting acts of harassment to a supervisor." And for inmates who had concerns, the jail's inmate handbook contained instructions for submitting a grievance and outlined the process for filing an "Inmate Request form" that would be investigated and answered within seventy-two hours. Unsatisfied inmates could escalate a grievance, including to the chief of police if necessary.

These grievances, as well as more minor complaints and general administrative questions, were submitted by inmates through an electronic kiosk system at the jail. The kiosks were in common areas, and only Mize, Poe, Johnson, and the assistant chief of police had access to the system—though Mize was not sure that Poe or the assistant chief "ever knew how to log into it." Jailers, however, could not access any inquiry or grievance submitted through the kiosks—the administrative questions all went to Mize, and the grievances to either Mize or Johnson. From 2016 through

2018—the two years surrounding the allegations here—Mize did not recall receiving grievances "from any female inmate concerning sexual exploitation" through the kiosk system.

The extent of sexual-harassment-specific training is disputed terrain. When the City hired jailers, it instructed them on the use of force and first aid; everything else was generally taught on the job. But one non-defendant jailer testified that she, two other jailers, and Johnson received a week of training at the Jefferson County Academy about "the basics on sexual harassment." Johnson also recalled completing sexual-harassment training and received a 2013 certificate of completion, but could not remember many details because it had been "so many years ago." She did know that sexual harassment was "not allowed" at the jail.

For his part, Boyd said it was "common sense" that jailers could not have sex with inmates. He recalled reading about custodial sexual misconduct "in the police academy." Buzbee too said it was "common knowledge" that sex with inmates was prohibited—and sexual harassment too. The City also asserted in discovery that both jailers received "on the job training" from employees who had attended the Jefferson County training.

**B.**

With that background, we now turn to the plaintiffs' allegations, viewing the evidence in their favor and drawing all inferences in that same direction at this stage of the case. *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024). The women—Whitley Goodson, Jessica Rainer, Megan Dunn, Allison

Mann, Charity Tessener, and Stacey Bridges—served varying terms of incarceration in Jasper City Jail.  Five plaintiffs accuse only Boyd of sexual misconduct, while one accuses both Boyd and Buzbee.

*Goodson.*  Goodson alleged that Boyd shocked her buttocks with a taser and said, "bet you like that because you are a freak." Around the same time, he pulled her aside to watch a pornographic video on his cell phone and would not let her leave.  Boyd later took her to an outdoor storage shed and had vaginal intercourse with her.  She did not want to, but "was scared to say no or to do anything to stop him."   Goodson later disclosed to state investigators that two other inmates—Rainer and Dunn—divulged to her that Boyd had assaulted them or talked to them about sex-related topics.

*Rainer.*  Rainer made similar allegations against Boyd, asserting that he took her into a closet where he made inappropriate sexual comments, shoved his hand down her pants, kissed her on her neck, and said he "couldn't wait to fuck" her. After that, Rainer avoided being "in a corner or close to a closet" anytime she saw Boyd.  Even so, Boyd followed her into a storage room after he had told her to drop off food there.  Once they were both inside, he kissed her and again put his hand down her pants. Impeded by her tight pants, he instructed her to change into looser ones.  Rainer protested, but Boyd insisted, cautioning her to make sure that no one saw her reenter the storage room after she

changed.  Once she returned, Boyd told her to sit on the freezer and had sex with her.

*Dunn.*  Dunn alleged that Boyd made sexually suggestive comments and advances toward her, one night telling her that he wanted her and a cellmate to "put on a show" for him.  Another time he told her that she was "just a little whore."  And on yet another evening, when Boyd escorted Dunn past a closet, he told her that's where they would go if he "want[ed] a kiss or something like that" because it was "one of the blind spots where the cameras can't see."  He then asked Dunn if she would "tell on" him if he propositioned her for sex.  Fearful that he would harm her, Dunn said she would keep quiet.  On her last night at the jail, Boyd took Dunn to a secluded area, where he kissed her neck, fondled her breasts, and put his hand down her pants.

*Mann.*  Mann too accused Boyd of sexually assaulting her.  As her release date approached, Boyd started asking Mann questions about her sexual preferences and history.  One night, Boyd took her out of her cell and into a storage space supposedly to "get some books."  There, he first penetrated her vagina with his fingers and then had vaginal intercourse with her.  Mann testified that she didn't protest because she "just wanted to be done."  Another time, Boyd ordered her to help him—but he instead took her into a closet, pulled his pants down, and told her to "suck it for him."  Feeling like she "had no choice," Mann performed oral sex on Boyd, who ejaculated onto the floor and handed her a towel to clean it up.

*Tessener.* Tessener also alleged that Boyd sexually assaulted her. Not pleased when she rebuffed him, Boyd removed her from her trustee position and placed her in lockdown for about six days, but his harassment continued. He first slid his hand across her buttocks, and another day masturbated in front of her.

Things got worse. A few days later, Boyd approached Tessener while she was working in a private area and began rubbing his penis against her backside. He taunted her: "if you ever tell anybody no one would believe you," and held her so that she couldn't turn around. Though Tessener resisted, Boyd raped her. After that, he assaulted her two or three times a week over the next several months—sometimes he ordered her into the same closet where he first raped her, and others he would take her into a room upstairs or an outdoor supply closet. Boyd often ejaculated onto the floor and told Tessener to clean it up.

*Bridges.* Bridges was the only plaintiff to sue Buzbee. She testified that he directed sexual remarks to her, groped her, kissed her, ran his hand down her pants, penetrated her with his fingers, tried to penetrate her with his penis, and forced her to perform oral sex on him—all while she was working as a trustee. Though she did not name Boyd as a defendant in her individual lawsuit, Bridges eventually alleged that he groped her, grabbed her, and made inappropriate comments in her presence.

## C.

The plaintiffs claim that their attempts to raise their concerns with jail staff were stymied. To start, they say the kiosks

for complaints simply didn't work. Tessener, for instance, said they were "always down." They had privacy concerns too, worrying that "anybody could have read" complaints submitted on the kiosks. But Mize called this fear unfounded—only he, Poe, Johnson, and the assistant chief of police had access to inquiries and grievances filed through the kiosks. By testifying that he checked the kiosks "multiple times a day," Mize implied that they were typically in working order.

For her part, Tessener said that she asked jailer Raeven Clay not to be left alone with Boyd, and Clay replied that Tessener was "not the first one [Boyd] has been that way with." And when state investigators interviewed Clay about sexual-assault allegations at the jail, she confirmed that Tessener asked her "not to leave her alone with Boyd." Clay, who is not a defendant, acknowledged that Tessener requested to be returned to her cell whenever Clay left to pick up meals and Boyd and Buzbee were the only jailers still there. She also recalled a day when Tessener appeared upset after finishing her trustee shift. When Clay asked what was wrong, Tessener told her that Boyd "made her get in the closet with him and ejaculated and made her clean it up." Clay, who did not report the allegations to anyone until her interview with state investigators, said that Tessener had told her that she had reported it herself. But Tessener denied having done so in her deposition, and nothing else in the record suggests that she did.

To be sure, the inmates did complain to Poe and Johnson— but it was about other issues, from water temperature and food

quality to the availability of hygiene products. Some inmates also started writing Poe letters, which were often delivered to him by another jailer, Monique Softley (the inmates felt comfortable approaching her). The City produced several of these letters from Tessener and Mann, and none made any reference, even implicit, to sexual assault. As for Softley, she could not testify about the letters she transmitted because she did not read them before sliding them under Poe's door, adding that no inmate "came to [her] about nobody sexually harassing them."

Tessener testified that she sent Poe a letter explaining that she "didn't like the way that Rusty [Boyd] would do things" at the jail. She says she gave the letter to Softley to deliver—but there is no copy of the letter in the record or evidence of its existence beyond Tessener's testimony.[1] When queried about notes from Tessener, Poe testified that he remembered receiving one or two letters from her "requesting to be a trustee" but nothing referencing sexual harassment. Poe maintained that if he had received any letter mentioning sexual misconduct, he "would have initiated an investigation immediately."

---

[1] The parties dispute whether this letter exists. Though one letter sent around December 2017 includes a request for Poe to "come speak with" Tessener, it addresses only Tessener's complaints about work on a particular trustee assignment. Because this appeal comes before us on a grant of summary judgment in the defendants' favor, however, we assume that Tessener wrote the letter described in her testimony, and that Poe received and read that letter. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc).

Finally, there is evidence that Softley told chief jailer Johnson that another jail employee, Jonathan Long—who was never a defendant in this suit—was sexually assaulting Tessener. According to Softley, Johnson replied that she had "told John he [was] going to get caught doing the things that he [was] doing." Johnson acknowledged that Softley escalated a complaint from Tessener about Long, but added that she had never observed any inappropriate conduct between inmates and jail staff. During her deposition, Johnson admitted hearing rumors of Long "talking dirty" to Tessener, and also signed a statement noting that she had heard that Long made "inappropriate advances" toward Tessener.

Other evidence undercuts that account, starting with the fact that Softley did not work on the day that she first said she heard Johnson's comment. The jail incident log lacks any mention of an assault, and Mize confirmed that the log does not contain "any report of sexual misconduct by Monique Softley." Finally, Tessener herself testified that she was not sexually assaulted by anyone other than Boyd.

As for Boyd, Tessener later took matters into her own hands. In late 2017, she told two employees of the local animal shelter where she worked as a trustee that a jailer wanted "sexual favors." The employees replied that the jailer's conduct was inappropriate and "likely illegal," so Tessener asked to be referred to an attorney, which eventually led to this lawsuit. After Boyd's next assault, Tessener saved the towel that she used to clean up his ejaculate. She marked the towel with an "X," snuck it out of the

jail on her way to work at the shelter, and gave it to one of the employees for safekeeping. When Tessener later reported Boyd's assaults to state investigators, her lawyer turned over the towel, and the DNA sample matched Boyd.

The Alabama State Bureau of Investigation began looking into the allegations in January 2018. Investigators interviewed several witnesses, including plaintiffs Tessener, Mann, and Goodson, as well as Buzbee, Boyd, and other jail employees. Not interviewed was Bridges, the only plaintiff who alleged abuse by Buzbee. In the meantime, Poe placed Boyd on administrative leave.

Three months later, the Bureau forwarded its final report to the district attorney for presentation to a grand jury. Boyd resigned that month. Buzbee followed seven months later, citing "medical issues." The jail soon suspended the trustee program, and Mize and another police captain interviewed jailers to ferret out "any current harassment issues at the Jail." Finally, in January 2020, Boyd was indicted in state court on two counts of unlawful sexual conduct with a person in custody of the jail. *See* Ala. Code § 14-11-31(a).

## D.

Bridges, Rainer, Goodson, Dunn, Mann, and Tessener filed six separate complaints. They asserted claims under 42 U.S.C. § 1983 against Poe, Johnson, and the City for violations of their Eighth Amendment rights on theories of supervisory and municipal liability. Each plaintiff also sued Poe, Johnson, and the

City for violations of the Trafficking Victims Protection Reauthorization Act (TVPRA), and Bridges asserted additional state and federal claims against Buzbee. *See* 18 U.S.C. §§ 1591, 1595(a). For whatever reason, none of the plaintiffs filed claims against Boyd.

The district court consolidated the six complaints. After discovery, Poe, Johnson, and the City filed a joint motion for summary judgment. Poe and Johnson contended that the plaintiffs could not establish a causal connection between their actions and the alleged constitutional harms because the plaintiffs had "provided no evidence whatsoever" that Poe or Johnson knew about the alleged abuse. Nor, the defendants said, was there any evidence that Poe and Johnson "initiated the[] alleged customs or practices" allowing that abuse, which meant the plaintiffs could not show that their injuries were caused by a custom or practice adopted by a municipal policymaker as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The district court granted the joint motion for summary judgment, and dismissed all claims against Buzbee, Poe, Johnson, and the City.[2] *See Bridges v. Poe*, No. 7:19-cv-00529, 2022 WL

---

[2] Two preliminary points. *First*, the plaintiffs individually asserted various claims under state and federal law. They do not challenge the district court's grant of summary judgment to Poe, Johnson, and the City on their negligent hiring, conspiracy, and Fourth Amendment claims, so those claims are forfeited. *See United States v. Campbell*, 26 F.4th 860, 872–74 (11th Cir. 2022) (en banc).

22-12028              Opinion of the Court              15

1598437, at *2, *31–32 (N.D. Ala. May 19, 2022) (unpublished).  For Buzbee, the court granted his separate motion for summary judgment because Bridges failed to properly serve him.[3]  *See id.* at *10–11, *31 n.12.  For Poe and Johnson, the court concluded that qualified immunity applied because the plaintiffs had failed to show that the defendants caused their injuries.  *See id.* at *23–27.  For the City, the court determined that the plaintiffs failed to establish that it had a custom or policy of disregarding jailer misconduct.  *Id.* at *27.  This appeal followed.

## II.

We review a district court's grant of summary judgment de novo, viewing the evidence and drawing all inferences in the light most favorable to the plaintiffs.  *Nehme*, 121 F.4th at 1383.  Summary judgment is appropriate if "there is no genuine dispute as to any material fact" such that Poe, Johnson, and the City are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

*Second*, after granting the defendants' joint motion for summary judgment, the district court declined to exercise supplemental jurisdiction over two of Bridges's state-law claims against Johnson because no federal-law claims remained.  *See Bridges v. Poe*, No. 7:19-cv-00529, 2022 WL 1598437, at *31–32 (N.D. Ala. May 19, 2022) (unpublished).  Those rulings are unchallenged.

[3] Buzbee's counsel filed a responsive brief and appeared at oral argument, but because Bridges does not challenge the dismissal of her claim against him, we consider any argument that he remains in the case forfeited.

### III.

There are three issues before us.  *First*, all six plaintiffs challenge the district court's rejection of their claims that Poe and Johnson violated the Eighth Amendment because they tolerated the sexual abuse of inmates and failed to train jail employees about sexual exploitation.  *Second*, Rainer and Mann contend that their claims are not time-barred.  And *third*, Bridges, Tessener, and Goodson challenge the district court's grant of summary judgment on their TVPRA claims.

### A.

We start with the district court's qualified-immunity decision for Poe and Johnson in their individual capacities. Qualified immunity is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation omitted).  An official has the initial burden of raising a qualified-immunity defense by showing that she acted within her discretionary authority. *Est. of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018).  Once that threshold is satisfied, the burden shifts to the plaintiff to show that the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted).

The plaintiffs concede that Poe and Johnson acted within their discretionary authority.  And there is no question that the plaintiffs had a clearly established right to be free from sexual abuse

22-12028                Opinion of the Court                17

while incarcerated. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020). The question before us, then, is whether Poe and Johnson's actions (or inactions) violated that right.

The plaintiffs contend that Poe and Johnson did just that by tolerating the sexual exploitation of female inmates, failing to train against sexual misconduct, and neglecting to require reporting and investigation of the sexual abuse of female inmates. Boiled down, they claim two supervisory failures: (1) permitting an unconstitutional custom or policy of sexual abuse to flourish at the jail, and (2) failing to train subordinates that sexual abuse was wrong.

Supervisory liability of this sort is demanding. Without personal participation in a constitutional violation, a supervisor is liable only if the plaintiff can show that the supervising official's actions caused the alleged constitutional deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). One way to do that is to show that a supervisor's custom or policy reflected deliberate indifference to the plaintiff's constitutional rights. *Piazza v. Jefferson County*, 923 F.3d 947, 957 (11th Cir. 2019). That requires "subjective awareness of a substantial risk of serious harm to the inmate." *Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013); *see Wade v. McDade*, 106 F.4th 1251, 1253, 1262 (11th Cir. 2024) (en banc). All that to say, "the standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Keith v. DeKalb County*, 749 F.3d

1034, 1048 (11th Cir. 2014) (alteration adopted and quotation omitted).

### 1.

We begin with the plaintiffs' theory that the supervisors had a custom or policy of tolerating sexual assault. To show a constitutional violation in this way, a custom or policy must be so "longstanding and widespread" that we can understand it to be implicitly authorized by policymakers who were aware of the problem but failed to act.[4] *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quotation omitted). So the plaintiffs need to show that Poe or Johnson knew about "multiple incidents or multiple reports of prior misconduct by a particular employee." *Piazza*, 923 F.3d at 957 (citation omitted). Put differently, a single report is not enough—"even when the incident involves several subordinates." *Id.* (alteration adopted and quotation omitted). Instead, to prove that a custom or policy caused their constitutional injuries, the plaintiffs must show "a persistent and wide-spread practice." *Goebert v. Lee County*, 510 F.3d 1312, 1332 (11th Cir. 2007) (quotation omitted).

This threshold is high, as our precedents show. In one case, reports of understaffing had been made to supervisors so many times that "it was like whipping a dead horse." *Anderson v. City of Atlanta*, 778 F.2d 678, 683 (11th Cir. 1985). In another, supervisors

---

[4] Cases addressing municipal liability are "analogous" to supervisory liability, so we may use their holdings to assess Poe and Johnson's conduct. *See Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir. 1990).

failed to "act in response to the 'numerous' prior incidents of similar conduct of which they were specifically aware." *Danley v. Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). And in a third, a warden-supervisor "was put on notice by a history of widespread abuse" committed by "certain corrections officers." *Valdes v. Crosby*, 450 F.3d 1231, 1235, 1239 (11th Cir. 2006), *overruled in part on other grounds by Pearson*, 555 U.S. 223.[5]

Here, we have none of that. The plaintiffs' strongest available evidence shows—no matter how serious and violative Boyd's alleged abuses in particular were—that Poe had no warning about what had been going on, and Johnson had, at best, a single report about a different jailer. *See Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1265–67 (11th Cir. 2010) (two complaints to a high school principal about a teacher sexually harassing students did not reach the "obvious, flagrant, rampant and of continued duration" standard for supervisory liability on custom-or-policy theory (quotation omitted)). Without more, the plaintiffs cannot show

---

[5] The dissent suggests that we wrongly use *Danley* and *Valdes* to create a "rule" that "even 'numerous' instances of abuse may not be sufficient to demonstrate 'a persistent and wide-spread practice.'" Dissent at 13 n.4. Not so. In fact, we do not understand that contention. In both cases, this Court found that the plaintiffs *had* offered enough evidence because they showed two things: that there were numerous examples of misconduct and that the defendants knew about it. *Danley*, 540 F.3d at 1315; *Valdes*, 450 F.3d at 1235, 1239–41. And in any event, the rule the dissent imagines would have no role to play here, where the evidence shows *at most* a single report of abuse to a single supervisor.

that a custom or policy resulted in deliberate indifference to their constitutional rights.

We start with Poe. As police chief, Poe was the jail's highest-level supervisor, but neither party contends that he was part of its day-to-day management. The record lacks any evidence of in-person reports to Poe about assaults, and Poe disclaims any knowledge about jailer misconduct.

Tessener emphasizes the letter she wrote to Poe explaining that she "didn't like the way that Rusty [Boyd] would do things down there or the way things were going" in the jail. But even assuming, as we must, that the letter existed as Tessener described it, that is not nearly enough to show that Poe knew about, much less broadly tolerated, sexual assault against inmates. Receipt of a letter complaining in general terms about what one jailer was doing (without referencing anything sexual) does not come close to knowledge or approval of a policy of sexual abuse. Nor do the letters that *are* in the record contain any reference to Boyd or connections to sexual misconduct. Instead, they ask Poe for permission to receive mail from her father, or complain about being punished for another inmate's "stupid behavior." And Poe says that he did not learn about the plaintiffs' allegations until state investigators contacted him in January 2018—after the alleged abuse took place. Poe could not be deliberately indifferent about a risk that he did not know existed, and the plaintiffs have offered no evidence to suggest he did. *See Goodman*, 718 F.3d at 1334; *Wade*, 106 F.4th at 1262.

The claims against Johnson, the chief jailer, also come up short, though this time they do have at least one piece of evidence: testimony that Johnson heard Tessener and Long were having sex. The "exact words" that jailer Softley recalled hearing from an intermediary were that Tessener "said that John Long was down there sexually, you know, having sex with her, taking her out" to a shed for those purposes. Johnson allegedly replied, "I told John he is going to get caught doing the things that he is doing."

At this stage of the case, we assume that Johnson received and responded to this news exactly as outlined above. But as we have said, pointing to a "single incident of a constitutional violation is insufficient to prove a policy or custom." *Craig*, 643 F.3d at 1311. Rather, a plaintiff "must point to multiple incidents" of misconduct or cite "multiple reports of prior misconduct by a particular employee." *Piazza*, 923 F.3d at 957. While Johnson's alleged comment suggests that she may have suspected other misconduct—of what kind, it's unclear—we cannot stretch it to infer that she had received multiple reports of abusive behavior by Long (or anyone else). That is all the more true considering that each plaintiff conceded to not informing any jail supervisor— including Johnson—about the alleged misconduct.

The other evidence reinforces Johnson's limited knowledge. Johnson told Mize that someone informed her that "Jailer John Long had had sex or attempted to have sex with an inmate Charity Tessener" in the storage facility. In her written statement, Johnson explained that she had told him that she "had heard that Charity

Tessener had accused C/O Jonathan Long of making inappropriate advances towards her while inside" the jail's storage facility. Notes from her interview with state investigators stated that Johnson "remembered that Corrections Officer (CO) [Monique] Softley told her that Tessener complained about CO Jonathan Long 'talking dirty' to her 2–3 weeks prior." And Johnson conceded during her deposition that she informed the State Bureau of Investigation about the report, but she said nothing about other incidents or inmates. Johnson, in short, may have known about one non-defendant jailer's alleged assault on one inmate.[6]

Timing also presents a problem for the plaintiffs. True, "post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (alteration adopted and quotation omitted). But the only reports of sexual abuse to reach either Poe or Johnson came from

---

[6] To be sure, we must read all reasonable inferences in the plaintiffs' favor. "But inferences in favor of a plaintiff can be based only on evidence—not on speculation." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020). And several facts point the other way here. For starters, Softley, the witness who claimed she informed Johnson about the abuse, did not work on the date she says she first heard Johnson's comment. The jail log lacks any mention of the incident. And Tessener herself testified that she was not sexually assaulted by anyone at the jail other than Boyd—including Long. These facts undercut the plaintiffs' insistence "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Doe v. Drummond Co.*, 782 F.3d 576, 604 (11th Cir. 2015) (quotation omitted).

Tessener—the last inmate released from the jail.[7]  Even assuming the most inculpating version of the conversation about Tessener and Long, Johnson heard about Tessener's allegations in November 2017—after Bridges, Rainer, Dunn, and Goodson had already been released.  So, *at most*, that discussion could support the allegations of inmates still incarcerated as of November 2017—Tessener and perhaps Mann.[8]  There is no evidence that Johnson had notice of similar misconduct by any jailer against any inmate before then.

In sum, this is not a case where Johnson was frequently alerted to jailers' misconduct.  *Cf. Anderson*, 778 F.2d at 683.  Nor was Johnson "specifically aware" of "numerous prior incidents of similar" abuse by jailers.  *Danley*, 540 F.3d at 1315 (quotation omitted).  Failing to "point to multiple incidents or multiple reports of prior misconduct by a particular employee," the plaintiffs cannot establish the required causal link between Johnson's conduct and their injuries.  *Piazza*, 923 F.3d at 957 (citation omitted); *see also Cottone*, 326 F.3d at 1360–61.  Johnson's alleged awareness of a

---

[7] For reference, Bridges was released in May 2017, Rainer in August 2017, Dunn and Goodson in September 2017, and Mann in early November 2017. *See Bridges*, 2022 WL 1598437, at *5–8, *12, *17, *21, *31.  Tessener was transferred from the Jasper City Jail to Walker County Jail in January 2018 and released in March of that year.  *Id*. at *8.

[8] Mann was released on November 9, 2017.  Softley testified that she "may not" have told Johnson of Long's misconduct on November 5—"it could have been the 7th, 11th."  So it is unclear from the record whether Johnson knew of the alleged abuse before Mann's release.

single claim of alleged abuse by one jailer who is not a defendant in this lawsuit does not show that the jail had a custom or policy resulting in deliberate indifference to the plaintiffs' rights.[9]  *See Piazza*, 923 F.3d at 957; *Wade*, 106 F.4th at 1262.

**2.**

The plaintiffs also fault Poe and Johnson for "failing to train against sexual exploitation when that training was obviously necessary."  We disagree.

Section 1983 allows supervisors to be held liable for failure to train subordinates "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact."  *Keith*, 749 F.3d at 1052 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (alteration adopted)).  To succeed on this claim, however, the plaintiffs must show that Poe or Johnson had "actual or constructive notice that a particular

---

[9] The dissent repeatedly uses plural forms to suggest that Johnson received more complaints about sexual abuse than she did.  To take one example, the dissent asserts that "there is testimony that Johnson knew that *jail officers* were sexually assaulting *inmates*."  Dissent at 17–18 (emphasis added).  The problem?  The record reveals that Johnson only heard about a single officer (Long) sexually assaulting a single inmate (Tessener).  No more, no less.  True, Johnson said that she "told John he [was] going to get caught doing the things that he [was] doing."  One could speculate, as the dissent does, that Johnson suspected Long might be involved in some other unspecified misconduct.  But that speculation is a far cry from the dissent's assertion that Johnson had been told that *other jailers* were engaged in misconduct, much less that she had been told that *other jailers* were involved in the specific misconduct of sexually assaulting inmates.

22-12028              Opinion of the Court              25

omission in their training program" caused the jail's employees to violate inmates' constitutional rights—yet still elected to retain that insufficient training program. *Id.* (quotation omitted). Establishing notice ordinarily requires a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). And a supervisor's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61; *see also Keith*, 749 F.3d at 1053.

The plaintiffs cannot succeed on their failure-to-train theory for several reasons. *First*, their contention that there was no policy "prohibiting jailers from having sex with inmates" is simply not true. The jail's internal manual directed that employees could not "fraternize, cohabitate or engage in sexual activity with any inmate." Jail employees were also prohibited from "subject[ing] inmates to any form of physical or emotional abuse." And the manual required employees to record "any disturbances, injuries, attempted assualts [sic] or suicides" in the jail log, with incident reports forwarded to the jail administrator.[10]

*Second*, neither Poe nor Johnson was on notice that a "particular omission in their training program" caused the sexual abuse. *See Connick*, 563 U.S. at 61. As explained, only Johnson was

---

[10] We note too that jail employees *did* undergo training. Softley and Johnson, for example, testified to receiving sexual-harassment training via the Jefferson County program. While Buzbee and Boyd did not attend that program, the City attested that both received "on the job training" from jailers who did. It is thus difficult to label the Jasper City jailers as "untrained employees." *Keith*, 749 F.3d at 1053.

aware of, at most, one report of sexual misconduct. Lacking that notice, decisionmakers like Johnson "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62.

*Third*, liability will not attach for failure to train where the proper response "is obvious to all without training or supervision." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (quotation omitted). Both Buzbee and Boyd testified that they knew from "common sense" and "common knowledge" that it was wrong for them to have sex with or sexually harass female inmates. No argument there—the fact that "a police officer should not (and may not) sexually assault citizens in his custody is obvious to all without training or supervision." *Christmas v. Harris County*, 51 F.4th 1348, 1357 (11th Cir. 2022) (quotation omitted); *see also McGuire v. Cooper*, 952 F.3d 918, 923 (8th Cir. 2020). So too here. Given the obviousness of the misconduct, the failure to train subordinates against sexual exploitation will not support an inference of deliberate indifference.

★        ★        ★

We do not minimize the seriousness of the plaintiffs' allegations. But the standard for supervisory liability is "extremely rigorous." *Keith*, 749 F.3d at 1048 (quotation omitted). Because the plaintiffs have failed to meet that benchmark, the district court properly granted qualified immunity, and thus summary judgment, to Poe and Johnson in their individual capacities.

## A.

We turn now to the plaintiffs' Eighth Amendment claims against Poe and Johnson in their official capacities. These claims operate as the functional equivalent of suits against the City itself. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

Municipalities do not enjoy qualified immunity from suit, but the individual actions of their employees generally do not subject them to § 1983 liability. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Monell*, 436 U.S. at 691. As with supervisory liability, a municipality cannot be held responsible for the actions of its employees based only on respondeat superior. *See Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994). Instead, the plaintiffs must show (1) that their "constitutional rights were violated"; (2) "that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right"; and (3) "that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom or policy must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quotation omitted). Put differently, it must operate as "the functional equivalent of a policy adopted by the final policymaker." *Church*, 30 F.3d at 1343. Finally, municipalities, like supervisors, may be held liable for failure to train their employees. *See Connick*, 563 U.S. at 61.

The plaintiffs' claims against the City mirror those against Poe and Johnson in their individual capacities.[11]  The district court rejected them for the same reason: a failure to establish that the City had a custom or policy of disregarding jailer misconduct that amounted to deliberate indifference.  *See Bridges*, 2022 WL 1598437, at \*13–14, \*27.  We agree.

There is no evidence that the City knew about the alleged misconduct until the state investigation, let alone that it had a permanent practice permitting sexual misconduct that was so well settled as to carry the force of law.  *See Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *Monell*, 436 U.S. at 691, 694.  And as discussed, Johnson's knowledge of a single allegation of misconduct by a jailer did not represent a "persistent and widespread practice" that was "so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker."  *Goebert*, 510 F.3d at 1332 (quotation omitted); *Church*, 30 F.3d at 1343.

The failure-to-train claim is even weaker, and we reject it on the same grounds as the plaintiffs' claims against Poe and Johnson in their individual capacities—a written policy barred sexual contact with inmates, neither Poe nor Johnson knew that an alleged omission in the jail's training program caused the plaintiffs' injuries, and it was obvious to all that sexual abuse of inmates was

---

[11] The City does not challenge Poe or Johnson's status as final policymakers. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion).

prohibited.    The district court properly granted summary judgment to the City on these claims.

**B.**

We next turn to Rainer and Mann's argument that their claims are timely.  Section 1983 claims are subject to state statutes of limitations governing personal injury actions.  *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).  The events took place in Alabama, so we look to Alabama law for the deadline.  *See Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996).  And because the state applies a two-year statute of limitations to personal-injury claims, that limitation period governs.  *See* Ala. Code § 6-2-38(*l*).

Even so, federal law substantively determines when the plaintiffs' cause of action accrued.  *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987).  That happens—and the statute of limitations begins to run—when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  *Rozar*, 85 F.3d at 561–62 (quotation omitted).  Put simply, a federal civil rights claim accrues "when the plaintiff has a complete and present cause of action."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quotation omitted).

Rainer and Mann both filed their complaints outside of Alabama's two-year statute of limitations.  Rainer testified that her last sexual contact with Boyd was on August 22, 2017.  She was released from the jail on August 24, 2017, and filed her complaint

on August 26, 2019.[12]  Mann was released on November 9, 2017, and filed her complaint on December 2, 2019.  Each plaintiff had "a complete and present cause of action" by the last time Boyd allegedly assaulted her.  *Id.* (quotation omitted).  For Rainer, that was August 22, 2017.[13]  For Mann, it was no later than her own release date—November 9, 2017.  Because neither filed her complaint within two years, the claims are untimely.

Rainer and Mann try to sidestep this result by pointing to Alabama's Williams-Coleman Act, which provides a civil cause of action for human-trafficking victims.  *See* Ala. Code § 13A-6-157(a).  It contains a tolling provision for victims who "could not have reasonably discovered the crime" due to "psychological trauma, cultural and linguistic isolation, and the inability to access services."  *Id.* § 13A-6-158(a)(3).  And because Rainer and Mann allege that they *could* have brought their claims under the Act, they say that the "plain language" of its tolling provision applies here.

Not so.  Neither Rainer nor Mann asserted claims under the Williams-Coleman Act, and that statute's tolling provision applies only to persons who file civil actions for offenses "defined by this

---

[12] August 24 and 25, 2019, were a Saturday and Sunday, which would move the filing date to Monday the 26th if Rainer's release date were the date of accrual.  *See* Fed. R. Civ. P. 6(a)(1)(C).

[13] Rainer argues that her claim accrued on her release date, rather than the last time Boyd assaulted her.  Aside from citing no authority to support this argument, Rainer did not present it to the district court.  We thus do not consider it.  *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1352 (11th Cir. 2009).

article." *Id.* Rainer and Mann offer no support for their argument to the contrary besides their contention that the tolling provision "generally applies to all victims of custodial sex violations." It does not, and Rainer and Mann's claims are time-barred.

## C.

Finally, Bridges, Tessener, and Goodson challenge the district court's grant of summary judgment on their claims against the City for sex trafficking in violation of the Trafficking Victims Protection Reauthorization Act.

The TVPRA prohibits sex trafficking by force, fraud, or coercion. *See* 18 U.S.C. § 1591. It also creates a civil cause of action for victims to sue perpetrators, or anyone who knowingly benefits from participating in a scheme that the "person knew or should have known" violated the statute. *See id.* § 1595(a). A plaintiff asserting a claim under that statute must show that "the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). A claim fails unless it satisfies all of these elements. *Id.* at 726–27.

The plaintiffs contend that jailers and inmates orchestrated a trade of trustee status for sex. The City knowingly benefited (and

profited) from this arrangement, they say, because of the free labor trustees performed around the jail.

We cannot agree. Most important, given that the officials were unaware of the alleged trustee scheme, the City could not "knowingly benefit" from it. *See id.* at 724. And even if we were to accept that female trustees conferred some kind of financial benefit on the City by cutting costs, that would not be enough. There is zero evidence that the City *knowingly* benefited from the program, or that its officials had "constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff[s]." *Id.* at 726. The City is entitled to summary judgment.

★    ★    ★

This is a difficult case. The plaintiffs' allegations of abuse are jarring. Still, they failed to offer evidence that the jail's officials knew about it at all—much less that they were running the jail with a wink-and-nod policy that sexual assault was accepted and acceptable. The evidence also reveals no doubt that the jailers knew they were not allowed to treat the women this way. But breaking the rules is different than not having them.

Civil liability for supervisors and municipalities is a difficult standard, and on that the plaintiffs have failed to meet their burden. We thus **AFFIRM** the district court.

22-12028            ABUDU, J., Dissenting in part            1

ABUDU, Circuit Judge, dissenting in part:

The risk of sexual violence against women increases for those who are incarcerated.[1] The Prison Rape Elimination Act ("PREA"), coupled with appropriate local policies, was designed to address and deter instances of sexual assault against this vulnerable population.[2] As the first piece of federal legislation targeting the issue of sexual abuse of incarcerated individuals, PREA established a "zero-tolerance standard" for such sexual abuse in prisons. 34 U.S.C. § 30302(1); *Sconiers v. Lockhart*, 946 F.3d 1256, 1271 (11th Cir. 2020) (Rosenbaum, J., concurring). Among other avenues for relief, the Eighth Amendment specifically prohibits jail officials from ignoring "a substantial risk of serious harm" when they are "actually, subjectively aware" of a risk and fail to take objectively reasonable steps to remedy the violation. *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (*en banc*). In those instances,

---

[1] According to a recent study, "[w]ithin correctional settings in the United States, incarcerated women disproportionately experience staff-on-inmate sexual victimization. Whereas women comprise only 7% of prison inmates, 33% of victims of staff-perpetrated sexual victimization in prisons are women. Of additional concern, only 8% of women's experiences of staff-perpetrated sexual victimization are estimated to be formally reported." Gina Fedock et al., *Incarcerated Women's Experiences of Staff-Perpetrated Rape: Racial Disparities and Justice Gaps in Institutional Responses,* 36 J. INTERPERSONAL VIOLENCE, 8668, 8668–87 (2021).

[2] Relevantly, compliance with the standards PREA sets forth requires escalation of reports of sexual assault. While states that are not compliant with the PREA may receive reduced federal funding for detention facilities, compliance is not mandatory. *See* 34 U.S.C. § 30305.

2                    ABUDU, J., Dissenting in part              22-12028

qualified immunity cannot shield an official from such deliberate indifference which results in actual harm. This holds true even where there is little evidence to indicate the likelihood of substantial risk of serious harm is high. For example, in *Nelson v. Tompkins*, we affirmed the district court's denial of qualified immunity to Keyvon Sellers, an intake officer who failed to notify anyone of the underlying racial motivations for Jayvon Hatchett's aggravated assault on a White man, which he learned of while conducting Hatchett's intake. 89 F.4th 1289, 1297–99 (11th Cir. 2024). While there was evidence that Hatchett, a Black man, was able to live with White cellmates for several days without any incident, and "barely more than a scintilla" of evidence that his attack on his White cellmate was racially motivated, we determined that Sellers' knowledge of the underlying racial motivations behind Hatchett's first offense were sufficient to provide Sellers with "fair warning that it was unconstitutional not to prevent" Hatchett from being alone with a White cellmate. *Id.* at 1299–1300.

The undisputed facts in this case show that, while some jail officials remained ignorant of the sexual abuse that women in the Jasper City jail experienced, there was at least one official—Deborah Johnson—who was notified, consulted, and directly asked to intervene to stop ongoing violations. Because the record creates, at a bare minimum, a genuine question of fact regarding the extent of Johnson's knowledge, the steps she should have taken after receiving notice, and whether those steps were objectively

22-12028          A BUDU, J., Dissenting in part          3

reasonable, she is not entitled to qualified immunity.[3]  Accordingly, I respectfully dissent in part.

## I.    REVELANT BACKGROUND

First, a full account of the facts pertaining to Johnson, viewed in the light most favorable to the non-moving parties and drawing all reasonable inferences in their favor, is necessary.  *Stanley v. City of Sanford*, 83 F.4th 1333, 1337 (11th Cir. 2023).  Pertinent to analyzing this case and reviewing the district court's judgment is the evidence of both undisputed and disputed facts contained in the record on appeal, including sworn affidavits, deposition transcripts, and the documents the parties submitted.

### A. Johnson and Operating Procedures

Throughout 2017, Johnson was one of two top-ranking officials in command of the Jasper City Jail.  Although the Chief of Police, J.C. Poe Jr., served as the final authority over the jail, it was Johnson who handled the jail's day-to-day operations.  As the jail supervisor, her duties included training employees, and monitoring their compliance with rules, regulations, and other policies and procedures.  Her position further involved assisting jail officers and other subordinates in carrying out their tasks, creating employee schedules, adequately staffing all shifts, reviewing logbooks for needs she could address, conducting jail walkthroughs, and

---

[3] Additionally, given that the district court's dismissal of the state law claims against Johnson was premised upon the dismissal of the federal claims against her, the district court's dismissal of the state claims warrants reversal as well.

training subordinates to complete their assigned tasks. Johnson also was responsible for addressing incidents at the jail, whether reported through staff during or immediately after a shift, through word of mouth, or from the jail's logbook.

In addition, Johnson directly engaged with inmates. The jail's trustee program allowed supervisors to select individuals to work on various tasks for the entire city, not just tasks in the jail. Johnson or other jail staff could assign a trustee to wash cars, launder uniforms, do landscaping, prepare meals, move heavy furniture, and clean up. Although men and women could be trustees, the men were usually assigned to outdoor assignments while the women were assigned to more indoor tasks. The program required a formal selection process of those inmates allowed to participate in the trustee program. However, some of the Appellants testified that certain jail officers nevertheless would escort inmates out of their cells under the guise of the trustee program, even though those inmates were not assigned to the program at the time and otherwise had no permission to be outside of their cells.

*B. Jasper Police Department Policies Regarding Reports of and Responses to Sexual Assault in the Jail*

Jail staff testified that the City failed to train or instruct jail officers in the prevention or response to sexual misconduct towards inmates. When jail officers were hired, they received training on use of force and first aid, but everything else was generally taught on the job. Importantly, Johnson's testimony about on-the-job training omits any mention of training on sexual misconduct, and

22-12028          ABUDU, J., Dissenting in part                5

both Dennis Buzbee and Rusty Boyd, two of the primary perpetrators of sexual violence against Appellants, confirmed that they never received such training.

The record evidence regarding the City's written policies, practices, and procedures for the prevention, detection, and punishment of rape and other forms of sexual assault and harassment at the jail consists solely of excerpts from: (1) the Jasper Police Department Manual (the "JPD Manual"), (2) the jail's internal manual, and (3) the City Employee Handbook. Other than a blanket prohibition against "subject[ing] inmates to any form of physical or emotional abuse" or "engag[ing] in sexual activity with any inmate," there is nothing in the jail manual that addresses the process for reporting and addressing complaints of sexual misconduct. The City Employee Handbook and the JPD Manual are even less helpful—neither document mentions anything about the policies and procedures for inmates lodging complaints against jail officers.

The only written policies that mandate reporting in some instances are located in the JPD Manual. In particular, the JPD Manual required Johnson, as the jail supervisor, to "make an immediate, impartial report to [her] commanding officer relating any incident which [s]he is aware of that involved a violation of law or department regulation by any . . . employee of the department." Similarly, the JPD Manual required all employees to immediately report to their supervisor "any information given to [them] . . . by any citizen regarding matters that indicate the need for police action." Those general mandates notwithstanding, Appellees did not

produce any evidence detailing the process through which employees should have investigated or expedited complaints of sexual assault that were not based on the employee's first-hand knowledge. Moreover, there is no evidence of any procedures or other steps that Appellees took to monitor or track complaints of sexual assault in the jail. Indeed, the Appellees failed to produce any documents showing their compliance, or any efforts to comply, with PREA.

### C. Inmate Complaints Regarding Sexual Misconduct

Appellants produced evidence corroborating that both supervisors and regular jail officers implemented an unwritten policy of actively discouraging complaints. This unwritten policy carried additional force and was especially effective given the absence of formal policies that encouraged inmates to file complaints or policies specifying the process for investigating such complaints.

Moreover, although inmates could submit complaints through kiosks that the jail operated, the kiosks' actual functionality remains a disputed fact. The record evidence lacks a physical description of the kiosks; however, it is clear from context that they were electronic devices with screens and the capacity to receive typographical input from inmates. Among other functions, the kiosks were designed as a means for inmates to communicate directly with jail staff, but not outside third parties. Despite the purported accessibility of the kiosks, some Appellants explained that reporting sexual assault through the kiosks was not feasible. For example, Charity Tessener stated that she knew about the kiosks,

but they were usually non-operational during her incarceration. Further, while the majority accepts as true Appellees' claim that grievances submitted through the kiosks were only accessible by jail administrator David Mize or Johnson, the record shows that Appellants had reason to believe this was not the case given the kiosks' public location and electronic format. Tessener was among those concerned about privacy given that "anybody could have read" any complaints she submitted through the kiosk.

Bridges also testified that jail employees actively discouraged inmates from filing complaints, even through the kiosks. She said that when she was previously incarcerated at the jail, Johnson chastised her for lodging complaints through a kiosk. Specifically, Bridges explained that when she submitted complaints through the kiosk, Johnson would "jump all over [her] because [she] had just reported something that [she] didn't agree with." According to Bridges, Johnson "said that we were making her look bad," and "[Johnson] said she would start taking away privileges" if complaints continued to be filed through the kiosk. Instead, Johnson ordered Bridges to make any complaints in person, either to jail officers after a shift change or directly to Johnson. There also was testimony from Jessica Rainer that Johnson responded poorly to in-person requests for assistance. Specifically, Rainer asserted that in addition to acting "rude" and "hateful" towards inmates, Johnson simply refused to assist inmates even with requests for basic necessities. For example, Rainer explained that when inmates on their menstrual cycle asked Johnson for feminine hygiene products, she would not regularly provide them, and those inmates would

8                    ABUDU, J., Dissenting in part            22-12028

sometimes have to wait until the next shift or even the next day to get supplies.

In addition to Johnson's alleged censuring of inmate complaints, there is evidence in the record that inmates experienced or risked being retaliated against if they reported staff misconduct. During her deposition, Tessener explained that early one day before she was transferred out of the jail, Maverick Bahrick, another jail officer, pulled her out of her cell and cornered her alone. Bahrick said that he "heard [she] might have a lawsuit or something on Rusty [Boyd] and the Police Department." He allegedly told Tessener: "[M]ake sure you don't do this because Rusty has family in this police department and has a big name . . . and you just don't want to do that, just so you know, you just don't want to do that." Tessener said that she interpreted Bahrick's statements as a threat.

Like Tessener, Bridges feared retaliation for any report of staff misconduct. Bridges testified that when she told her cellmate about the sexual acts Buzbee coerced her to do, she asked her cellmate not to tell anyone about those incidents because she feared "being punished in some type of way." Bridges also declined to tell any jail staff about other officers' unlawful behavior until the day she was released. Even then, Bridges told only Raeven Clay, a jail officer whom she described as different from other staff members. Bridges suspected she "would be punished in some way" if she told anyone other than Clay about Buzbee and Boyd's misconduct.

Monique Softley, another jail officer, testified that she, too, observed inmates' reluctance to report staff misconduct. Softley

said she could tell that something was wrong with the Appellants she worked with, but when she would ask them what was wrong, they did not want to mention the sexual assaults. Softley believed their silence was because the inmates knew she was likely to expedite any complaint to other JPD staff. Her exact testimony was that "[t]hey [the inmates] did not come to me with it because they knew I would be the first one to take the first step to let it be known" and that if she received a complaint of sexual assault, she "would have went and told it [sic]."

### D. Inmate Complaints to Johnson Regarding Sexual Misconduct

As to Johnson's knowledge about assaults, harassment, and other unlawful behavior at the jail, Softley testified that she personally informed Johnson that another jail officer was sexually assaulting Tessener, but Johnson never acted on that information. Softley, who was one of Johnson's subordinates, testified that on November 5, 2017, a male inmate told her that Jonathan Long, another jail officer, had been sexually assaulting Tessener. Softley said she immediately reported this information to Johnson and that, in response, Johnson said she "told John he [was] going to get caught doing the things that he [was] doing." Softley stated that she reminded Johnson to report the incident to the lieutenant or assistant chief over the jail. Johnson neither investigated the incident that Softley reported, nor did she bring it to Poe or anyone else's attention.

Mize's written statement is also probative of Johnson's knowledge that Tessener was being sexually assaulted at the jail.

Mize wrote that on January 10, 2018, he went to the jail to assist with a state investigation into a JPD employee. As Mize collected various records for the investigation, he asked Johnson to assist him with obtaining certain logbooks. According to Mize, Johnson asked him, "[I]s this what I have already heard about?" Johnson explained to Mize that "a while back" someone told her that Long either "had sex or attempted to have sex with . . . Tessener" in the storage unit outside the jail. Mize then reminded Johnson that she was supposed to immediately report any allegations of sexual misconduct by a jail officer to her supervisor—in this case, Mize or Poe.

The record also contains a written statement, with Johnson's signature, supporting Mize's account of his conversation with her. The statement was dated January 12, 2018, and said that Johnson told Mize that she "had heard that Charity Tessener accused . . . Jonathan Long of making inappropriate advances towards her . . . ." Johnson admitted that the statement bore her signature, but she maintained that she had no memory whatsoever of the described interaction with Mize or the admissions to him.

During her deposition, Johnson wavered as to the extent of her knowledge regarding Tessener's allegations of sexual assault, but she admitted to hearing "rumors" of "dirty talk" from jail officers in front of inmates. She also conceded that she took no action at all in response to what knowledge she did have. When the Alabama State Bureau of Investigation ("SBI") interviewed Johnson on January 26, 2018, she indicated she had only recently heard rumors

22-12028          ABUDU, J., Dissenting in part          11

regarding sexual misconduct at the jail.  She specifically admitted that Softley reported a complaint from Tessener that Long was "talking dirty" to her.  During her deposition, she testified that she heard the rumors about Long and Tessener "two to three weeks prior" to the SBI interview.  According to Johnson, she did not ask Softley for any clarification or additional information when Softley reported the "dirty talk" complaints to her.  When asked whether she knew of a written JPD policy requiring her to report even rumors concerning sexual misconduct, Johnson replied that "[t]here may be," but she did not give a definite answer.  Although Johnson claimed she would have taken reports of sexual misconduct seriously, she again conceded that she failed to report or investigate Softley's allegations.  Incredibly, Johnson claimed she just "forgot all about it."

## II.   DISCUSSION

On appeal, Appellants challenge, *inter alia*, the district court's grant of summary judgment on their Eighth Amendment claims against Johnson in her individual and official capacity.

### A.  Appellants' Individual Capacity Claim

When a state official raises a qualified immunity defense, the official bears the initial burden of proving that they were acting within their discretionary authority.  *See Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020).  Then, only if the official meets that burden, the onus shifts to the plaintiff to show why the official is not entitled to qualified immunity.  *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007).  Although qualified immunity

shields public officials "when they perform their duties reasonably," it does not circumvent "the need to hold public officials accountable when they exercise power irresponsibly." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Here, the parties concede that, at all relevant times, Johnson was exercising her discretionary responsibilities. They also agree that the Appellants' right to protection against sexual assault while incarcerated is clearly established. *See Griffin Indus.*, 496 F.3d at 1199; *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[P]rison officials . . . must take reasonable measures to guarantee the safety of the inmates." (internal quotation marks and citation omitted)). Thus, the only question at issue is whether Johnson's actions and/or inactions violated the Appellants' clearly established Eighth Amendment right.

A supervisor may be held liable under Section 1983, even absent personal participation in the constitutional violation, if the plaintiff can show "a causal connection between the actions of [the] supervising official and the alleged constitutional deprivation." *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2008), *as recognized in Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010). Plaintiffs can establish a causal connection by showing that either: (1) a widespread history of abuse put the supervisor on notice of the need to take corrective action, or (2) the supervisor's custom or policy results in deliberate indifference to a constitutional right. *Id.* Conversely, plaintiffs "can also show that the *absence* of a policy led to a violation of constitutional rights." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957 (11th Cir. 2019) (emphasis in original). In either case,

22-12028          ABUDU, J., Dissenting in part          13

a causal connection relies on the supervisor's "subjective knowledge of a risk of serious harm" and a reckless disregard of that risk. *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1048 (11th Cir. 2014); *see also Wade*, 106 F.4th at 1258 ("[A] deliberate-indifference plaintiff must show that the defendant official was subjectively aware that his own conduct—again, his own actions or inactions—put the plaintiff at substantial risk of serious harm.").

Whether liability is premised on action or inaction, a causal connection requires evidence of multiple incidents of misconduct or multiple reports of prior misconduct by one employee. *Piazza*, 923 F.3d at 957. An individual plaintiff's "proof of a single incident of unconstitutional activity is *not* sufficient" to meet this standard, *see Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (emphasis added) (citation omitted), but this Court has not otherwise established a minimum threshold,[4] *see, e.g., id.* (finding no causal

---

[4] The majority opinion relies on this Court's prior opinions in *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2008), *as recognized in Randall*, 610 F.3d at 710, and *Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006), *overruled in part on other grounds by Pearson*, 555 U.S. 223 (2009), to show that the minimum threshold of evidence needed is so "high" that even "numerous" instances of abuse may not be sufficient to demonstrate "a persistent and wide-spread practice" of abuse necessary to establish a causal connection between a supervisor's actions and the alleged constitutional violation. However, in neither *Danley* nor *Valdes* did this Court create such a rule. Instead, in both *Danley* and *Valdes*, this Court's analysis focused on a case-specific inquiry of whether a defendant was sufficiently put on notice of the misconduct at issue and relied on evidence of multiple reports of misconduct to conclude that they were. *See Danley*, 540 F.3d at 1315; *Valdes*, 450 F.3d at 1239–44.

connection where the plaintiff's evidence was limited to the actions of multiple employees evaluating his one reported medical issue over several days); *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991) (affirming district court decision holding sheriff liable where he "knew of prior instances of mistaken identity," without identifying the specific number of prior instances); *Anderson v. City of Atlanta*, 778 F.2d 678, 685–86 (11th Cir. 1985) (finding that "persistent" understaffing and "complaints . . . lodged with . . . supervisors," although not specific in number, were "[c]ertainly . . . sufficient to show a custom or policy of understaffing").

Appellants in this case argue that Johnson was a part of "a custom of tolerating sexual exploitation of female inmates, of failing to train against sexual exploitation when that training was obviously necessary, and of failing to require reporting and investigation of the sexual exploitation of female inmates . . . ." They contend that these customs or policies were causally connected to their sexual assaults, which violated their Eighth Amendment rights.

Supervisory liability claims premised on a custom or policy require not only establishing that the pertinent custom or policy existed; a plaintiff must also show that the policy resulted in deliberate indifference. *See Cottone*, 326 F.3d at 1360; *Rivas*, 940 F.2d at 1496. Applying the deliberate indifference standard to the prison context, the Supreme Court has held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a

22-12028          ABUDU, J., Dissenting in part          15

substantial risk of serious harm." *Farmer*, 511 U.S. at 842. This Court, sitting *en banc*, recently clarified its application of *Farmer*, holding that liability for an Eighth Amendment deliberate-indifference claim requires a plaintiff to show: (1) "that [s]he suffered a deprivation that was 'objectively, sufficiently serious,'" and (2) "that the defendant acted with subjective recklessness as 'used in the criminal law.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 834, 839). Further, to meet the subjective recklessness prong, the plaintiff "must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff . . . ." *Id.* Neither party here contends that the alleged sexual assaults fall short of objectively serious harm sufficient to invoke the Eighth Amendment's prohibition of cruel and unusual punishment. *See Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981))). However, Appellants must still meet their burden of showing subjective recklessness, which includes subjective knowledge. *See id.* at 837; *Wade*, 106 F.4th at 1262.

"A prison official possesses actual, subjective knowledge of a substantial risk when the official is 'both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw[s] the inference.'" *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320–21 (11th Cir. 2016) (alteration in original) (quoting *Farmer*, 511 U.S. at 837). A jury may find the subjective knowledge element satisfied by the very fact that the risk was obvious, but plaintiffs asserting supervisory liability

claims must still show a heightened degree of culpability as compared to general negligence. *Id.* at 1321. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* (internal quotation marks and citation omitted).

"Deliberate indifference 'has two components: one subjective and one objective.'" *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020) (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014)). Thus, subjective knowledge, alone, is not enough—supervisory liability also requires plaintiffs to show that the defendant's response to the risk at issue was objectively unreasonable. *See id.* at 1270–71; *see also Farmer*, 511 U.S. at 844; *Wade*, 106 F.4th at 1262 (Jordan, J., concurring) ("[T]he reasonable response component of deliberate indifference is objective and not subjective . . . ."). In other words, a detention facility supervisor violates the Eighth Amendment when he or she fails to take reasonable steps to ensure and maintain, even inside a penal institution, the "contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Hope v. Peltzer*, 536 U.S. 730, 742 (2002) (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)). Additionally, cases addressing municipal liability are "analogous" to supervisory liability; thus, this Court may use the holdings in municipal liability cases to aid in our assessment of Johnson's behavior here. *See Greason v. Kemp*, 891 F.2d 829, 837 (11th Cir. 1990).

While our precedent requires plaintiffs asserting supervisory liability claims to show a "subjective awareness of a substantial risk of serious harm to the inmate," *Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013), those cases do not require that the defendant be subjectively aware of the risk from a particular subordinate, *see Farmer*, 511 U.S. at 843 ("[A] prison official [may not] escape liability for deliberate indifference by showing that . . . he did not know that the complainant was especially likely to be assaulted by the specific [person] who eventually committed the assault.").

The record is replete enough with evidence of Johnson's subjective knowledge for a reasonable jury to conclude that she was deliberately indifferent to the risk of sexual assault against Appellants. Johnson's entire role was dedicated to the daily functions of the jail, and her duties included supervising jail officers, training them to fulfill their roles, and maintaining overall standards at the jail which included advising Poe or Mize of any report of sexual assault on an inmate. Yet, despite Johnson's responsibilities over the jail, its officers, and the safety of its inmates, there is testimony that Johnson knew that jail officers were sexually assaulting inmates and failed to intervene.

As a recap, Softley specifically told Johnson that inmates were complaining about male guards making sexual advances towards them, inappropriately touching them, and outright instances of sexual assault. Johnson's response—"[I] told John he [was] going to get caught doing the things that he [was] doing"— is proof that she already was aware of such complaints, that she knew of at least

one officer by name who was accused of misconduct, and that the behavior was not isolated. Even after Softley reminded Johnson to report the incident to the lieutenant or assistant chief over the jail, Johnson neither investigated the complaints, nor did she bring them to Poe or anyone else's attention.

There was also written evidence of Johnson's knowledge. Mize documented his time assisting with a state investigation into allegations against a JPD employee and Johnson's comment to him: "[I]s this what I have already heard about?" Johnson told Mize that she "had heard that Charity Tessener accused . . . Jonathan Long of making inappropriate advances towards her," and that "a while back" someone informed her that Long either "had sex or attempted to have sex with . . . Tessener" in the storage unit outside the jail. Further, during her deposition, Johnson admitted to hearing "rumors" of "dirty talk" from jail officers in front of inmates "two to three weeks prior" to the state's investigation and that she did nothing about it. Like Softley, Mize reminded Johnson of her obligation to report the abuse, which she did not do. Instead, she "forgot all about it." The record also shows that Johnson discouraged inmates from reporting grievances dating back as early as 2016, thus supporting a jury finding that Johnson adopted and exercised a policy of ignoring jail officer's sexual misconduct throughout the time period at issue in this case.

Moreover, the district court erroneously concluded that the November 2017 timing of Softley's report to Johnson regarding Tessener and Long was not "early enough" to show that Johnson

22-12028          ABUDU, J., Dissenting in part          19

had a widespread, permanent, and well-settled custom or practice of disregarding sexual misconduct against inmates. *Bridges v. Poe*, No. 7:19-cv-00529-LSC, 2022 WL 1598437, at \*26 (N.D. Ala. May 19, 2022). Again, Johnson's response to Softley indicated that Softley was not the first person to inform Johnson of these sexual allegations. However, if November 2017 arguably is the sharp line for purposes of identifying the earliest date when Johnson became aware of jail officers sexually abusing inmates, the allegations against Boyd involved behavior that continued well into December 2017. There was still ample time for Johnson to take the necessary steps to investigate the inmates' and Softley's complaints and to prevent the ongoing sexual assault on inmates that the SBI investigation exposed.

Finally, even after establishing that a supervisor is aware of a risk, liability requires showing that he or she "react[ed] to this risk in an objectively unreasonable manner." *Keith*, 749 F.3d at 1047 (quoting *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (*en banc*)); *see also Farmer*, 511 U.S. at 844. Even assuming Johnson's subjective knowledge remains a disputed fact, her response to the risk of sexual assault is not disputed—she did nothing. Inaction is not an acceptable response from a jail supervisor receiving a report of a subordinate sexually assaulting inmates. The jail's policies with respect to its chain of command required her to inform Poe or another supervisor of the reports she received. In fact, Poe's immediate response to the report of alleged sexual assault demonstrates the significance of Johnson's inaction. The same day the SBI contacted him, Poe permitted the agency to interview employees

and inmates at the jail, and he transferred Tessener to a different facility. The following day, Poe placed Boyd on administrative leave, which halted any future interaction between Boyd and inmates. Unfortunately, all of Poe's remedial actions took place in January 2018, way past the time when Johnson became aware of the abuses happening and could have acted to protect inmates from further assault.

In sum, a jury could find that Johnson had the requisite subjective knowledge regarding sexual misconduct at the jail and that she failed to take reasonable steps towards addressing the complaints she received. Those findings would support an ultimate conclusion that Johnson's deliberate indifference amounted to a violation of Appellants' constitutional rights. Therefore, she was not entitled to summary judgment as to the Eighth Amendment claim against her in her individual capacity.

B.  *Appellants' Eighth Amendment Claim Against Johnson in her Official Capacity*

Appellants' Section 1983 claims against Johnson in her official capacity are the functional equivalent of claims against the City of Jasper. *See Goodman*, 718 F.3d at 1335 n.4 ("[A] suit against a governmental official in his official capacity is deemed a suit against the entity that he represents." (quoting *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999))). With such claims, municipal liability may be premised upon "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th

22-12028          ABUDU, J., Dissenting in part          21

Cir. 1994).  Appellants' official capacity claim against Johnson, and thus the City, is premised on the Appellees' alleged custom or policy of tolerating jail officers' sexual misconduct, failing to implement measures to prevent and respond to sexual assaults on inmates, and "failing to train against sexual exploitation when that training was obviously necessary," which Appellants contend led to the violation of their Eighth Amendment rights.  Thus, Appellants' claims against the City are essentially claims for a failure to train and supervise.

Municipalities may be held liable under Section 1983 for failure to train; however, liability only exists where a municipality's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' . . . ."  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  In circumstances where the proper response "is obvious to all without training or supervision," a failure to train or supervise is generally insufficient grounds for municipal liability. *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997) (quoting *Walker v. City of New York*, 974 F.2d 293, 299–300 (2d Cir. 1992)).  While the holding in *Sewell* permits municipalities to reasonably rely on the common sense of employees, "[a] pattern of known misconduct . . . may be sufficient to change reasonable reliance into deliberate indifference."  *Floyd v. Waiters*, 133 F.3d 786, 796 (11th Cir.), *vacated and remanded*, 525 U.S. 802 (1998), *and reinstated*, 171 F.3d 1264 (11th Cir. 1999).

In addition, while identification of the alleged municipal custom or policy is a "threshold" issue, *McDowell v. Brown*, 392 F.3d

1283, 1290 (11th Cir. 2004), a plaintiff's claim need not be confined to a single policy deficiency, *see, e.g.*, *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (affirming jury verdict for plaintiff who "claim[ed] that the county had inadequate policies for training, supervision and discipline"). To the contrary, where a violation of constitutional rights arises from a series of customs or policies that cumulatively amount to a final policymaker's deliberate indifference, a municipality may still be held liable. *See id.*

To succeed on their municipal liability claims, Appellants had to show that the City had a custom or policy which was the "moving force" behind the alleged constitutional deprivation. *Sewell*, 117 F.3d at 489 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978)). Appellants, therefore, had to identify a municipal policy or custom, that Johnson executed, which in turn caused Appellants to be unsafe and vulnerable to sexual assault, sexual harassment, or other mistreatment in violation of their Eighth Amendment rights. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." (quoting *City of Canton*, 489 U.S. at 385)); *see also Baker v. City of Madison*, 67 F.4th 1268, 1281–82 (11th Cir. 2023) ("A municipality may be held liable for the actions of its law enforcement officers only when the officers' execution of official policy (or custom) is the moving force of a constitutional violation.").

A plaintiff must also show that there was an action taken or policy made "by an official responsible for making final policy in

22-12028          ABUDU, J., Dissenting in part          23

that area . . . [or] a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Goodman*, 718 F.3d at 1335. At the district court, Johnson did not dispute her status as a final policymaker. On appeal, the City similarly waives any argument that Johnson was not a final policymaker.

Next, there is evidence in the record that Johnson had subjective knowledge that jail officers under her command were abusing inmates, and that she regularly discouraged inmates and jail staff from reporting sexual misconduct. Overall, there is sufficient support for Appellants' claims that Johnson carried out a custom or practice of tolerating sexual assault and, despite a pattern of known misconduct, failed to train employees or otherwise act to prevent such unlawful behavior on the part of her subordinates. Accordingly, the evidence also leads to a finding of deliberate indifference such that the City would be liable for the violation of Appellants' Eighth Amendment rights.

### III.    CONCLUSION

For the foregoing reasons, the Eighth Amendment claims against Johnson in her individual and official capacity should have proceeded to trial, and the district court erred in granting summary judgment in her favor. Therefore, I respectfully dissent in part.